STATE of Missouri, Plaintiff–Appellant,

v.

Terry L. VINSON, Defendant–Respondent.

No. 18433.

Missouri Court of Appeals,
Southern District,
Division One.

May 20, 1993.

Kenny C. Hulshof, Asst. Atty. Gen., Jefferson City, spec. prosecuting atty., for plaintiff-appellant.

Bradford Kessler, Kessler, Soffer & Ryals, Clayton, for defendant-respondent.

SHRUM, Judge.

The state brings this interlocutory appeal from the trial court's order suppressing statements the defendant Terry Vinson made after he and the prosecutor entered into a purported "immunity agreement" and statements the defendant made after he and a highway patrol officer "voided" the agreement. We affirm in part and reverse in part.[1]

### FACTS

By an indictment filed January 8, 1992, the defendant was charged with first degree murder, first degree robbery, first degree burglary, and armed criminal action arising out of the August 22, 1990, robbery at a Charleston, Missouri, supermarket and the shooting and beating death of the store's night manager.

By written motion the defendant sought to suppress various statements he had made to law enforcement officers. The trial court heard testimony on the defendant's motion on August 12, 1992, and September 8, 1992.

The transcript of suppression motion hearing reveals the following. Acting on a tip from an informant, officers Tarrants and Tanner of the Charleston Department of Public Safety took the defendant into custody on September 6, 1990, advised him of his constitutional rights, conducted a videotaped interview of him, and released him. The defendant made no incriminating statements during the September 6 interview.

---

1. Section 547.200.1, RSMo 1986, permits the state, through the prosecuting attorney, to appeal "from any order or judgment the substantive effect of which results in: ... (2) Suppressing evidence; or (3) Suppressing a confession or admission." Rule 30.02 describes the procedure for such interlocutory appeals.

On September 7, 1990, Tanner took the defendant to Cape Girardeau, Missouri, for a polygraph examination by B.J. Lincecum, a private polygraph operator. Lincecum gave the defendant a *"Miranda* warning" [2] and advised him of his right to refuse the polygraph examination. The defendant signed a permission form that included the *Miranda* warning and a waiver of his constitutional rights. Lincecum then conducted his customary pre-test interview during which the defendant talked to him about the homicide. Lincecum testified,

> He said that on the night in question, the night of the robbery, that he had picked up a black guy and a white guy and drove to the rear of the [supermarket]. They got out, meaning the people that he had picked up, and later on—he waited for them, and later on he heard a shot. He started to drive away, but that the black guy came out and blocked him, blocked his way and—so he couldn't drive off. And he mentioned something about a .38 was in the car that he had to get rid of.

Lincecum then administered the polygraph examination to the defendant, the focus of the test being whether the defendant was a participant in the crimes. Lincecum testified that after the testing was complete, the defendant "said something to the effect that he knew the polygraph was right. He knew he was not telling the truth, but that that's all he could say."

That same day, upon his return to Charleston, the defendant was again advised of his rights, which he waived, and he was reinterviewed. During that interview, the subject of "immunity" arose. Officer Tarrants testified:

> Q. (by the prosecuting attorney to Tarrants): Now, during the course of that interview there was some discussion about—I'll use the term "immunity." Were you present during this discussion about immunity?

> A. Yes, sir. I was.

> Q. Can you put this in context for us? How did this discussion of immunity first arise?

> A. During a brief meeting with then prosecutor, Mr. Lynn Brown, and Officer Tanner and the director of Public Safety, Bob Ritchie, and which I was present, Officer Tanner advised us of the outcome of that—of the polygraph and that he felt that there was more evidence to be gained from Terry and that he was holding back information. And Mr. Brown ... the prosecutor decided that if—by offering Terry this immunity, that it might get him to open up and give more vital information as to what occurred that day at [the supermarket].

Former prosecutor Brown testified at the suppression hearing about the September 7, 1990, discussion of "immunity" for the defendant:

> Q. (by the prosecuting attorney to Brown): Could you set up for us, sir, how it was that this meeting came to be between yourself, officers, and the Defendant?

> . . . .

> A. [T]he police officers called ... and asked me to come over.... And when I got over there Terry was a bit emotional, a little upset.... [The officers present] told me that Mr. Vinson had maybe just gotten back from taking a lie detector test and had not passed it, I believe. And they felt like and then I felt like that Mr. Vinson had something to say and that he was holding back and he was on the verge of telling us what happened. And we were—We kind of put our heads together to figure out how and what we could do to try to offer something to Mr. Vinson to tell us what he knew.

> Q. [W]as part of the concern that he may have been covering up for someone else?

> A. Yes. Yes.

---

**2.** In *Miranda v. Arizona,* the Court set out what has become known as "the *Miranda* warning" as a means of satisfying the "procedural safeguards" required to protect an individual's privilege against self-incrimination. 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630[66, 67], 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

Q. Were there discussions—negotiations entered into between you with the Defendant actually there listening and having input into those discussions?

A. We talked a bit outside Mr. Vinson's hearing, but most of our negotiations were in the room where Mr. Vinson was located. And, you know, we kept throwing some things around. We started to throw a few ideas around and possibilities in front of Mr. Vinson to see if he would agree to some things and eventually he did agree to a deal that we offered him.

Brown testified about "the essence of the deal." He said he and the officers told the defendant they would "give him immunity" from prosecution "if you were not inside the building and if you didn't pull the trigger ... [a]nd if you will testify fully, completely, and truthfully as to who did commit the murder, who pulled the trigger, who was inside the building, who was there with you...."

An agreement was typed at the direction of Brown and signed by Brown and the defendant.[3] The agreement provided:

I, Lynn Brown, Prosecuting Attorney of Mississippi County, Mo., agree that *NO* criminal charges will be filed against Terry Lynn Vinson relating to the burglary, theft, and murder at Town and Country Supermarket in Charleston, Missouri occurring on or about August 22, 1990 provided that Terry Lynn Vinson:

1. Provides a *complete* and *truthful* statement of the events he witnessed on the evening of August 22, 1990.
2. Testifies fully and truthfully at any and all preliminary hearings and/or trials that are a result of this investigation.
3. Testifies *fully* and *truthfully* against any and all subjects arrested and/or charged in this investigation. (Emphasis in original.)

Brown testified there were additional conditions to the grant of "immunity," namely that the defendant "was not the person who went into the building ... was not the person who pulled the trigger ... was not the person who actually committed the murder...." Brown said those conditions were omitted from the written agreement because of an "oversight."

According to Brown, the defendant understood that upon execution of the written agreement he would make a videotaped statement, and "the deal was off, unless he told the full complete truth at that time." In that videotaped statement, the defendant admitted he was at the supermarket when the crimes were committed but he said he remained in the car while two other persons, one of whom he identified by name, entered the store. After making the statement, the defendant was released.

Charleston police officers and a Missouri Highway Patrol polygraph operator questioned the defendant on several subsequent occasions in September 1990, and the defendant testified at the November 27, 1990, preliminary hearing of two other persons implicated in the crimes. During those interviews and at the preliminary hearing, the defendant made various statements about his degree of involvement and the identify and degree of involvement of others. Those statements conflicted with one another and with the information he had given on and before September 7.

Although the defendant's conflicting accounts appear to violate in numerous ways the written "immunity agreement" and the oral conditions described by former prosecutor Brown, the state did not revoke the purported agreement or charge the defendant until after Sergeant Jim Keathley of the Missouri Highway Patrol became involved.

Keathley interviewed the defendant at the prosecuting attorney's office on October 28, 1991, following a polygraph examination of the defendant by Lincecum on that date. Before he questioned him, Keathley determined that the defendant could read, that he understood the English language, and that he had attended school

---

**3.** The agreement also bears the signature of a notary public, although there is no notary's acknowledgment on the document.

through the eleventh grade. Keathley used the Missouri State Highway Patrol "Notification and Waiver of Rights" form to give the defendant the *Miranda* warning. Keathley said he and the defendant read the form together and the defendant told Keathley he understood the form. The defendant signed the form indicating he understood his rights and was waiving them. Keathley said the defendant at no time requested an attorney.

Keathley said he then produced a photocopy of the "immunity" agreement. The defendant identified his signature on the agreement. Keathley read the document with the defendant, asked him if he understood it, circled the word "truthful," and asked the defendant "if he thought that he had been truthful and had lived up to the expectations of this agreement." Keathley said the defendant told him "he did not testify truthfully" because "Jesse Vinson, Jr., his brother, is actually the one that had pulled the trigger at the murder scene." The defendant admitted to Keathley that he had not testified "fully" about the incident and that he had not testified truthfully at the preliminary hearing because of his brother's involvement.

Keathley asked the defendant if "we should void this form and he agreed that we should void it." Keathley wrote "VOID" in three places on the face of the document: across the text of the agreement, across the signature of the prosecutor, and above the signature of the defendant. At the bottom of the document Keathley wrote:

Didn't testify truthfully against Jessie Vinson Jr.

Didn't testify fully about the incident and Jessie Vinson's Involvement.

Was deceptive about James Cryer's involvement in the murder.

I understand that this agreement is null and void due to my untruthful state-

ments to the police and during court testimony concerning this case.

Keathley asked the defendant if he understood the agreement was void because of his untruthful statements to the police and at the preliminary hearing, and the defendant responded, "Yes, that's true." Keathley testified he told the defendant that "null" meant "invalid or void," and he said he "went to great pains to go over this with him. I talked to him in detail about this and the consequences of this. I told him that this could be a long prison term. Could possibly even result in the death penalty. And he still agreed that he wanted to cleanse his soul and tell the truth about what had happened here. And since he hadn't done that, he wanted this agreement voided where he could feel free to tell the truth finally." Following this discussion, the defendant signed the document beneath Keathley's handwritten statement.

After the defendant signed below the "null and void" language on the photocopy of the immunity agreement, he gave Keathley an oral statement about the crimes. Keathley wrote what the defendant had told him, they read the statement together, at the defendant's request a paragraph was added exculpating James Krier,[4] and the defendant signed each page of the five-page statement.

On November 8, 1991, Keathley interviewed the defendant who was in custody but had not obtained counsel.[5] The interview was conducted at the county courthouse. After Keathley orally advised the defendant of his constitutional rights, the defendant's brother, Jesse, entered the room. When Keathley asked the defendant about his accusation that Jesse had committed the murder, the defendant said, "I've just made the whole thing up. I wasn't even there. None of this happened." Because the defendant did not want to talk in the presence of his brother, Keathley had Jesse leave the room. At

---

**4.** Various spellings of James Krier's surname appear in the record.

**5.** From the hearing transcript, we learn that the defendant had been arrested and arraigned on November 7, 1991. It appears he was charged

on that same date although we find nothing in the record to indicate the nature of the charges. Presumably he was charged by information rather than indictment.

that point, the defendant told Keathley that he (the defendant) pulled the trigger and that the only other participants in the crime were Glen Welch and James Krier.

In its entirety, the trial court's order disposing of the defendant's motion to suppress states:

> Defendant's First Amended Motion to Suppress Statements of the accused is sustained in part and overruled in part, as follows:
>
> Any statement of the accused, whether written, oral, or videotaped, given after the signing of the "Immunity Agreement" (State[']s Exhibit 12 or 3) on September 7, 1990, are hereby suppressed from admission into evidence in this case.

## ISSUES ON APPEAL

Although the trial court did not issue findings and conclusions, it is apparent from the arguments in the defendant's motion to suppress, the state's response, and the wording of the trial court order itself that the court considered the circumstances surrounding the "immunity agreement" as dispositive of the issue of the voluntariness of the defendant's various statements.

On appeal the state acknowledges that the prosecutor had no authority to grant the defendant immunity, and it argues the "doctrine of equitable immunity" does not aid the defendant because the defendant "violated each and every condition attached to the promise of leniency."[6] Therefore, the state argues, all of the defendant's statements should be admissible into evidence.

Alternatively, the state argues, "The record squarely establishes that [the defendant] was not induced to incriminate himself on either October 28 [1991] or November 8 [1991] by prior promises of leniency."

## DISCUSSION AND DECISION

■ The admissibility of inculpatory statements depends upon whether they were compelled within the meaning of the Fifth Amendment to the United States Constitution. *State v. Hughes*, 596 S.W.2d 723, 726[1] (Mo. banc 1980) (citing *Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970)).

> "[A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence...."

*Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897). Accord, *Brady; Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964); *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453[5], 9 L.Ed.2d 357, 364[5] (1963). Voluntariness of inculpatory statements, like that of a plea of guilty, "can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749, 90 S.Ct. at 1469[10], 25 L.Ed.2d at 757[9]. *See Hughes*, 596 S.W.2d at 726[2].

■ It is well settled in Missouri that an inculpatory statement extracted from an accused by a direct or implied promise of leniency is inadmissible. *State v. Schnick*, 819 S.W.2d 330, 336[10] (Mo. banc 1991); *State v. Chandler*, 605 S.W.2d 100, 116–17[3] (Mo. banc 1980). *See also State v. Hunter*, 456 S.W.2d 314 (Mo.1970), in which our supreme court stated:

> [C]onfessions induced by the influence of hope of leniency, *State v. Ball*, Mo.Sup. [1924], 262 S.W. 1043, hope of clemency, *State v. Hart* [1922], 292 Mo. 74, 237 S.W. 473, or hope of mitigation of punishment for the crime charged, or of "worldly advantage," *State v. Williamson* [1936], 339 Mo. 1038, 99 S.W.2d 76, are not voluntary and are not admissible in evidence.

---

6. In *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765 (Mo. banc 1987), our supreme court makes clear that Missouri prosecutors have no general statutory authority and no inherent authority to grant immunity. *Id.* at 768–69. In *Munn*, the court also discusses the "doctrine of equitable immunity." *Id.* at 769–70. We do not unnecessarily lengthen this opinion with a restatement of the *Munn* court's clear exposition.

456 S.W.2d at 316[2]. The law presumes that an inculpatory statement, induced by a person in authority who makes promises of leniency or immunity, is involuntary. *Williamson*, 339 Mo. 1038, 99 S.W.2d 76, 79–80[5,6]; *State v. White*, 316 Mo. 576, 292 S.W. 411, 412[4] (1927).

When an accused alleges that his inculpatory statements, made while in custody, are not admissible because involuntarily made, the state must bear the burden of proving the voluntariness of those statements. *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. *See Hughes*, 596 S.W.2d at 726. In reviewing a trial court ruling of a motion to suppress, an appellate court's inquiry is confined to whether the decision is supported by substantial evidence. *State v. Feltrop*, 803 S.W.2d 1, 12[25] (Mo. banc), *cert. denied*, — U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991); *State v. Figgins*, 839 S.W.2d 630, 636[2] (Mo.App.1992). In determining the sufficiency of the evidence, the facts and reasonable inferences are taken in the light most favorable to the order challenged on appeal. *State v. Blair*, 691 S.W.2d 259, 260[1] (Mo. banc 1985). Appellate courts defer to the opportunity of the trial court to judge the credibility of the witnesses. *Feltrop*, 803 S.W.2d at 12[2]. We review the trial court's decision under an abuse of discretion standard; we reverse the order only if it is clearly erroneous. *State v. Milliorn*, 794 S.W.2d 181, 183[5] (Mo. banc 1990).

There was substantial evidence at the suppression hearing to support a trial court finding that certain of the defendant's statements were induced by the state's promise of immunity. At the time the agreement was signed, police officers and the prosecutor believed the defendant was withholding information. As officer Tarrants testified, "[T]he prosecutor decided that if—by offering Terry this immunity, that it might get him to open up and give more vital information as to what occurred that day at [the supermarket]." The prosecutor's testimony confirmed that immunity was part of "a deal" to induce the defendant to provide information. It was the state, not the defendant, that initiated the idea of immunity. Only after the prosecutor and police officers "started to throw a few ideas around and possibilities in front of Mr. Vinson to see if he would agree to some things" that the defendant took the bait and signed the agreement.

The state argues that the defendant understood the written and oral conditions placed on the grant of immunity, that he violated "each and every condition attached to the promise of leniency," and, therefore, his statements must be deemed voluntary. The evidence supports a trial court finding to the contrary with respect to the statements made prior to the "voiding" of the agreement.

There was substantial evidence from which the court could have concluded the state considered the conditions—written and oral—to be meaningless and that the state conveyed its view of the inefficacy of the conditions to the defendant. After the agreement was signed on September 7, 1990, the defendant gave several accounts, not all of which could have been truthful, and some of which ran afoul of the supposed oral conditions omitted by oversight from the written agreement. Despite these violations of the written "immunity agreement" and the oral conditions, the state did not revoke the purported agreement or charge the defendant until after he and Keathley "voided" the agreement. The trial court rightly could have concluded the defendant and the state had tacitly agreed that many—perhaps all—of the written and oral conditions were of no effect.

Considering all of the relevant surrounding circumstances, we conclude there is substantial evidence to support a finding by the trial court that the defendant was induced by the "immunity agreement" to make the various statements until he and Keathley agreed to void the agreement. Inculpatory statements thus induced are not voluntary. *Williamson*, 99 S.W.2d at 79–80[5, 6]; *White*, 292 S.W. at 412[4].

To the extent that the trial court's order suppresses all statements made by the defendant after the state discussed immunity

in his presence and before he and Keathley voided the immunity agreement, it is supported by substantial evidence.[7]

■ We reach a different conclusion concerning the statements the defendant made after he and Keathley voided the immunity agreement. At issue is whether those statements are inadmissible as the "tainted fruit" of the prior governmental misconduct. In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Court gave this thumbnail sketch of the development of the "fruit of the poisonous tree"[8] doctrine:

> The doctrine requiring courts to suppress evidence as the tainted "fruit" of unlawful governmental conduct had its genesis in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); there, the Court held that the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence. The holding of *Silverthorne* was carefully limited, however, for the Court emphasized that such information does not automatically become "sacred and inaccessible." ...
>
> *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), extended the exclusionary rule to evidence that was the indirect product or "fruit" of unlawful police conduct, but there again the Court emphasized that

evidence that has been illegally obtained need not always be suppressed....

> Although *Silverthorne* and *Wong Sun* involved violations of the Fourth Amendment, the "fruit of the poisonous tree" doctrine has not been limited to cases in which there has been a Fourth Amendment violation. The Court has applied the doctrine where the violations were of the Sixth Amendment ... as well as of the Fifth Amendment.

467 U.S. at 441–42, 104 S.Ct. at 2507–08.

■ Just as the "fruit" of a Fourth Amendment violation need not, under all circumstances, be suppressed, a confession that follows a Fifth Amendment violation is not, under all circumstances, barred from use as evidence. As the Court said in *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), "[T]his Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Id.* at 540–41, 67 S.Ct. at 1398.

The general inquiry, under *Wong Sun,* is

> "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

---

**7.** The state relies heavily upon *State v. Sanders,* 714 S.W.2d 578 (Mo.App.1986), and *Stokes v. State,* 671 S.W.2d 822 (Mo.App.1984). Neither is helpful to the state.

*Sanders* is distinguishable from the case before us on numerous scores. First, *Sanders* involved a plea bargain. In the case before us the state's repeated references, in the trial court record and on appeal, to a "plea agreement" incorrectly characterize the arrangement the state devised. In *Sanders* the defendant repeatedly told police he wanted "to make a deal" and asked police "what he needed to do to get a 'deal' " with the prosecutor. 714 S.W.2d at 583. Here, it was the state's idea to fish for information using immunity as bait. In *Sanders* the defendant admitted that he "exercised free will in preparing to give a statement on videotape to the police," *Id.* at 587, and the trial court found the defendant's statements were voluntarily and knowingly made. *Id.* at 588. Here, the defen-

dant denies the statements were the product of an exercise of his free will, and the trial court, by its order, implicitly found the statements to be induced and, therefore, involuntary.

The germane issue in *Stokes* was whether the accused, having broken a plea agreement, could change his mind, agree anew to the terms of the agreement, and then insist that the state honor the agreement. Here we deal not with the enforceability of a plea agreement; our issue is whether there was substantial evidence from which the trial court could have concluded the statements were induced by a promise of leniency.

**8.** As Justice O'Connor suggests in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), metaphor and other figurative language, while helpful to explain certain concepts, are not on their own a substitute for analysis. 470 U.S. at 303–04 and n. 3, 105 S.Ct. at 1290.

371 U.S. at 488, 83 S.Ct. at 417[14] (quoting Maguire, *Evidence of Guilt* 221 (1959)).

Various opinions of the United States Supreme Court and the Missouri Supreme Court guide the *Wong Sun* inquiry. The United States Supreme Court, in *Brown v. Illinois*, assists the inquiry into whether a confession is "sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). In *Brown*, the Court said this question must be answered "on the facts of each case. No single fact is dispositive." 422 U.S. at 603, 95 S.Ct. at 2261[6]. The *Brown* opinion lists certain relevant "factors" to aid in the inquiry. Factors to be considered are whether *Miranda* warnings preceded the confession, the "temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. . . ." 422 U.S. at 603–04, 95 S.Ct. at 2261–62[7]. *See also State v. Kilgore*, 771 S.W.2d 57, 61[1] (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). The *Brown* factors are equally applicable to a review of an inculpatory statement that follows a Fifth Amendment violation. *Nix*, 467 U.S. at 442, 104 S.Ct. at 2508.

Additional guidance exists to determine the admissibility of a confession that follows a Fifth Amendment violation. "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Oregon v. Elstad*, 470 U.S. at 310, 105 S.Ct. at 1293[11] (citing *Westover v. United States*, decided together with *Miranda*, 384 U.S. at 494, 86 S.Ct. at 1638, 16 L.Ed.2d at 735). Where there is evidence that the "coercion has carried over," a *Miranda* warning alone is not sufficient to overcome the taint of a Fifth Amend-

ment violation on a subsequent confession. *Westover*, 384 U.S. at 496–97, 86 S.Ct. at 1639; *Bayer*, 331 U.S. at 541, 67 S.Ct. at 1398.[9]

It is at once apparent that the factors set out in *Brown* and *Elstad* overlap in some respects and that evidence that would show whether a confession is "a product of free will" might also demonstrate whether the earlier "coercion has carried over into the second confession." Certain of the factors are distinct, however, because of the different purposes of the exclusionary rule as it applies to violations of the Fourth and Fifth Amendments.

In the context of a Fourth Amendment violation, the exclusionary rule has as its prime purpose " 'to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " *Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974) (quoting *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974)).

The deterrent purpose of the exclusionary rule also applies where a defendant's Fifth Amendment rights have been violated. *Tucker*, 417 U.S. at 447, 94 S.Ct. at 2365. A second reason for the exclusionary rule exists where Fifth Amendment rights have been violated: protection of the courts from reliance on untrustworthy evidence. *Tucker*, 417 U.S. at 448, 94 S.Ct. at 2366; *Elstad*, 470 U.S. at 308, 105 S.Ct. at 1293.

In the case before us, there was evidence that Keathley advised the defendant of his rights verbally and in writing, that the defendant understood his rights, and that he waived those rights, orally and in writing. In addition, there was evidence that he admitted he had not been truthful and had not testified fully as he had agreed to do in the "immunity agreement," he agreed the document should be voided, he under-

---

9. *Elstad* makes clear the distinction between a case like the one before us in which a prior statement resulted from a Fifth Amendment violation and a case like *Elstad* that falls into the category of cases involving a "procedural *Miranda* violation." 470 U.S. at 304–06, 105 S.Ct. at 1290–91.

stood what it meant to void the agreement, and he understood the potential ramifications, including a possible death penalty, that might result if he were to agree to void the agreement and then make a truthful statement.

The combination of the *Miranda* warning, the intervening circumstance of the methodical voiding of the immunity agreement, and the fact that Keathley had not previously interrogated the defendant convince us that the defendant's statements made after the voiding of the agreement were "sufficiently a product of free will to break ... the causal connection between the illegality and the confession" and that the inducement that infected earlier statements has not "carried over into the second confession."

We are satisfied this holding passes muster when considered in light of the policy behind the exclusionary rule as it applies to Fifth Amendment violations. Regarding the "purpose and flagrancy of the official misconduct," this court is satisfied the *Miranda* warning, coupled with the defendant's knowing and voluntary voiding of the purported immunity agreement, make the defendant's decision "sufficiently a product of free will to break ... the causal connection between the illegality and the confession." *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. We likewise believe that the exclusion of statements the defendant made while the immunity agreement was in effect provides sufficient incentive to the state to deter it from future conduct of this nature.

We also are satisfied that any inducement wrought by the immunity agreement has not carried over into the defendant's statements he made after he voided the agreement with Keathley and, therefore, those statements are trustworthy. This is not a case in which a defendant's initial inculpatory statements were obtained through overtly or inherently coercive methods. *See, e.g., Darwin v. Connecticut*, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). Indeed, even in extreme cases where police have forced a full confession from an accused through unconscionable methods of interrogation, the coercive effect of such confessions can be dissipated. *Lyons v. Oklahoma*, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944) (cited in *Elstad*, 470 U.S. at 311–12, 105 S.Ct. at 1294). Here the defendant, although induced by the promise of immunity to make inculpatory statements, later knowingly and voluntarily surrendered whatever claim he thought he had to immunity. The voiding of the immunity agreement, coupled with the *Miranda* warning, convince us that no coercion infects the statements made to Keathley after the defendant and Keathley voided the agreement.[10]

We are not unmindful that it is the burden of the state to prove the voluntariness of the defendant's statements. And where a statement follows a Fifth Amendment violation, that burden is heavy. As our state's supreme court once noted,

> "Where a confession has been obtained under circumstances rendering it involuntary and inadmissible, a presumption exists that any subsequent confession arose from a continuance of the prior influence, and this presumption must be

---

**10.** A person who has confessed to a crime is faced with what has been described as the "cat-out-of-the-bag", dilemma. In *Bayer*, the Supreme Court stated:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

331 U.S. at 540, 67 S.Ct. at 1398.

As earlier noted, the *Bayer* opinion makes clear that an accused who makes an involuntary confession may, under certain circumstances, make a voluntary and admissible second confession. Thus, invocation of the cat-out-of-the-bag metaphor does not displace the need for analysis using the factors set out in *Brown* and *Elstad*. We also note that the defendant's "pre-immunity" statement to polygraph operator Lincecum was inculpatory and thus, to a certain extent, the cat was already out of the bag.

overcome before the subsequent confession can be received in evidence. The controlling influence which produced the prior confession is presumed to continue until its cessation is affirmatively shown...."

*State v. Bunton*, 291 S.W.2d 122, 125 (Mo. 1956) (quoting 16 C.J. *Criminal Law* § 1480 at 722–23 (1918)).

We believe the state has carried its burden and affirmatively shown the controlling influence that produced the earlier statements ceased before the defendant gave his statements to Keathley. Keathley's testimony about his giving the *Miranda* warning and the circumstances surrounding the voiding of the immunity agreement, corroborated by the defendant's written acknowledgement that "this agreement is null and void," make a prima facie case of the voluntariness of the defendant's "post-immunity" statements. "Absent a showing of special circumstances, the state need only make a prima facie showing of voluntariness." *State v. Biddy*, 748 S.W.2d 794, 798[3] (Mo.App.1988) (citing *State v. Thomas*, 596 S.W.2d 409, 412[4] (Mo.banc 1980)). If a defendant contends there are special circumstances that would result in the confession being involuntary, it is incumbent on him to present evidence to support his contention. *State v. Nolan*, 423 S.W.2d 815, 818[9] (Mo.1968). Here, there were special circumstances, i.e., the "immunity" agreement, but the state made a prima facie showing that it had been eliminated as an inducement before the defendant gave Keathley a statement. The defendant offered no evidence to the contrary.

The trial court order suppressing the defendant's statements to Keathley after the defendant and Keathley voided the immunity agreement is clearly erroneous. *See Milliorn*, 794 S.W.2d at 183[5]. That portion of the order must be reversed.

We affirm the trial court's order suppressing statements of the defendant except as to his statements given to Keathley after the defendant and Keathley voided the immunity agreement. We reverse that portion of the trial court's order that sup-

presses the defendant's "post-immunity" statements.

PARRISH, C.J., and CROW, P.J., concur.