2009 Ark. 390

**Kenneth Ray OSBURN, Appellant,**

v.

**STATE of Arkansas, Appellee.**

No. CR 08–1146.

Supreme Court of Arkansas.

June 25, 2009.

Rehearing Denied Sept. 10, 2009.

---

James W. Wyatt and Patrick J. Benca, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Deborah Nolan Gore, Ass't Att'y Gen., for appellee.

PAUL E. DANIELSON, Justice.

Appellant Kenneth Ray Osburn appeals from his convictions for capital murder and kidnapping and his sentences to life imprisonment without parole and life, respectively. He asserts three points on appeal, specifically, that the circuit court erred: (1) by failing to suppress two statements he made to police, which he claims violated his rights under the Fifth and Sixth Amendments and Article 2, §§ 8 and 10 of the Arkansas Constitution; (2) in admitting testimony regarding an incident that occurred twenty-seven years prior pursuant to Arkansas Rules of Evidence 403 and 404(b); and (3) in not granting his motion for new trial based on an allegation of juror misconduct. We reverse and remand Osburn's convictions and sentence.

Because Osburn does not challenge the sufficiency of the evidence to support his convictions, we will only briefly recite the general facts here and will set forth the more specific facts relevant to the points on appeal, as they are discussed. *See, e.g., Davis v. State,* 367 Ark. 330, 240 S.W.3d 115 (2006). On August 27, 2006, the car of seventeen-year-old Casey Crowder was found along the side of Highway 65 in Dumas, Arkansas. Casey's clothed body was later discovered, in Desha County along "forty-three canal" on September 2, 2006, with a black zip-tie around her neck. During the course of the investigation into her disappearance and death, Osburn became a person of interest. He voluntarily presented himself for an interview by in-

vestigators on September 4, 2006, and consented to searches of both his home and truck. Osburn was later arrested on September 28, 2006, and three separate statements were taken from him on that day, one of which was used as evidence against him at trial. He was tried by a jury, and, as already stated, Osburn was convicted of kidnapping and capital murder, and he was sentenced to life imprisonment without parole and life. He now appeals.

## I. *Statements to Police*

█ For his initial point on appeal, Osburn challenges the circuit court's denial of his motion to suppress two statements that he claims were violative of his rights under the Fifth and Sixth Amendments of the United States Constitution, as well as Article 2, §§ 8 and 10 of the Arkansas Constitution.[1] Specifically, Osburn disputes the circuit court's finding that after Osburn requested counsel, he initiated contact with investigators two separate times and voluntarily waived his rights, thereby rendering the two separate statements admissible. Osburn further claims that any waiver of his *Miranda* rights was the result of intimidation, coercion, deception, and promises of leniency by investigators. He asserts that these errors rendered his final statement "fruit of the poisonous tree."

Regarding Osburn's right-to-counsel claim, the State responds that Osburn clearly and unequivocally initiated contact with police prior to the statements and that the statements were made voluntarily. The State asserts that none of the investigators' statements made to Osburn during his interrogations constituted threats, but to the extent that they could be construed as threats, his statements were not the product of coercion. With respect to Osburn's claims regarding promises of leniency, the State maintains that the record does not demonstrate, nor does Osburn specifically assert, that any such promises induced or slightly influenced his statements.

The facts surrounding Osburn's statements are these. On September 4, 2006,

1. Osburn challenges the admissibility of his statements under both the Fifth and Sixth Amendment; however, "[t]he long-standing rule is that the Sixth Amendment right to counsel does not attach until 'the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Morriss*, 531 F.3d 591, 593 (8th Cir.2008) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion); *United States v. Edelmann*, 458 F.3d 791, 803 (8th Cir.2006)). At the time Osburn invoked his right to counsel, he had merely been arrested and no "adversary judicial criminal proceedings" had been initiated. For that reason, we address his arguments solely under the Fifth Amendment.

   With respect to Osburn's claims under the Arkansas Constitution, this court has previously observed:

   > [T]his court has consistently viewed the right to counsel provided by Article 2, sec-

   tion 10, as guaranteeing the same right conferred by the Sixth Amendment. *See, e.g., Beyer v. State*, 331 Ark. 197, 962 S.W.2d 751 (1998); *Jones v. State*, 314 Ark. 383, 862 S.W.2d 273 (1993), *cert. denied*, 512 U.S. 1237, 114 S.Ct. 2743, 129 L.Ed.2d 863 (1994); *Clements v. State*, 306 Ark. 596, 817 S.W.2d 194 (1991). Likewise, this court has observed that Article 2, section 8, is "our state constitutional equivalent" to the Fifth Amendment. *Clark v. State*, 256 Ark. 658, 659, 509 S.W.2d 812, 814 (1974). Additionally, this court has frequently relied on the Supreme Court's decisions in determining the scope of the right to counsel during custodial interrogation. *See, e.g., Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999); *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996); *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995), *cert. denied*, 517 U.S. 1226, 116 S.Ct. 1861, 134 L.Ed.2d 960 (1996).
   *Olive v. State*, 340 Ark. 343, 347–48, 10 S.W.3d 443, 445 (2000).

Osburn presented himself at the Southeast Arkansas Law Enforcement Center (SEALEC) and stated that he had heard that investigators wanted to speak with him and examine his truck. He was subsequently interviewed by Special Agent Rick Newton and Special Agent David Chastain of the Arkansas State Police at 2:55 p.m. (hereinafter, "the 09.04.06 2:55 interview"). The interview was not audio or video recorded, but was recorded via notes taken by Agent Chastain. During the interview, Osburn consented to searches of both his home and truck. In addition, after the agents noticed scratches on Osburn's arms, he permitted the agents to photograph his entire body.

At 11:15 p.m. that same day, Osburn was again interviewed, this time by Special Agent Newton and Agent Boyd Boshears of the Federal Bureau of Investigation, and the interview was audibly recorded (hereinafter, "the 09.04.06 11:15 interview"). The agents repeatedly attempted to obtain information or a confession from Osburn, to no avail. Osburn denied any involvement in Casey's disappearance and death and eventually stated that he wanted to get a lawyer. Despite that request, however, the interview continued. At the conclusion of the interview, Osburn was not arrested.

On September 28, 2006, however, an arrest warrant was issued for Osburn, and he was taken into custody. According to investigators, in an effort to avoid the media stationed at the SEALEC, Osburn was taken to a metal outbuilding located on the then-sheriff-elect's property near Dumas to be interviewed (hereinafter, "the

09.28.06 4:45 interview"). Again, Agents Newton and Boshears attempted to obtain a confession from Osburn, and, according to Agent Newton, used various tactics and investigative techniques in an attempt to "change his demeanor." While the transcript and the recording of the interview reveal that at one point Osburn asked the agents to call his lawyer, the interview continued.[2] Nonetheless, upon a subsequent request by Osburn for counsel, the 09.28.06 4:45 interview was terminated.

While Agent Newton was outside of the metal outbuilding making arrangements for Osburn's transportation, a conversation took place between Osburn and Agent Boshears, which was not recorded.[3] During the suppression hearing, Agent Boshears testified that Osburn asked him if he could see his family. Boshears explained that such was not his decision to make and that he would ask. He then explained the process that would take place, including transport and booking, followed by arraignment. Boshears testified that Osburn again asked to see his family and that Boshears assured Osburn that he would ask. At that time, according to Boshears, Osburn stated that he was "in a mess." After suggesting prayer, Boshears testified that Osburn asked him to pray for him and that Boshears responded that he had and he would. At that time, Boshears testified, Osburn became emotional, his demeanor changed, and he requested to see his daughter. After a brief discussion regarding faith, Boshears asked Osburn, according to the circuit court's findings, if he wanted to "keep talking," to which Osburn

---

**2.** During the suppression hearing, both Agent Newton and Agent Boshears testified that they did not hear Osburn's first request for an attorney in the 09.28.06 4:45 interview. We note, however, that then-Sergeant Michael Todd Daley testified that Agent Newton admitted to him that he had questioned Osburn after Osburn had asked for a lawyer.

**3.** Agent Boshears did record his recollection of the conversation in his investigatory notes, which were admitted at the suppression hearing for impeachment purposes by the defense.

replied that he wanted to "do the right thing and talk." Boshears then informed Agent Newton that Osburn "requested to continue our conversation."

Accordingly, the agents again interviewed Osburn (hereinafter, "the 09.28.06 7:25 interview"). While the 09.28.06 4:45 interview was audiotaped, the agents videotaped this interview. Osburn's *Miranda* rights form was reviewed and, at that time, Osburn confessed to his involvement.

Osburn was then taken to the SEALEC. While there, he briefly visited with his mother, daughter, and son. Afterward, Osburn approached then-Sheriff-Elect Jim Snyder, Osburn's friend and former employer, who was standing at the door of the room in which Osburn had met with his family. . Sheriff Snyder testified at the suppression hearing that Osburn denied that he "did that to that girl" and told him that he "was outside" himself "watching [himself] do it." Sheriff Snyder testified that he then went to get Agents Boshears and Newton and told them what Osburn had said, to which they responded "we better go back and talk to him." The three of them returned to the room, where Agent Boshears asked Osburn if he wanted to talk. Osburn indicated he did, and a rights form was completed. During the interview (hereinafter, "the 09.28.06 8:55 interview"), Osburn again confessed to his involvement.

Prior to trial, Osburn moved to suppress each of his statements, arguing that they were taken despite his requests for counsel and that he did not knowingly, voluntarily, and intelligently waive his rights. The State responded, and a hearing was held, at the conclusion of which the circuit court took the motion under advisement. The circuit court later entered its order, granting in part and denying in part Osburn's motion to suppress.

In its order, the circuit court made specific findings with respect to each of Osburn's interviews. Regarding the 09.04.06 2:55 interview, the circuit court found that the proof did not show that Osburn was a suspect at the time of the 09.04.06 2:55 interview and that the proof showed that Osburn was not in custody. It further rejected Osburn's argument that his *Miranda* rights were violated with respect to this interview, finding that it was clear that Osburn was not in custody when the statement was given.

With respect to the 09.04.06 11:15 interview, the circuit court found that, during the latter part of it, "the process and procedure used by the agents became accusatory." It further found that Osburn "unequivocally invoked his 5th Amendment right to counsel" on page seventy-eight and that "[h]e had the right to do so at this time." The circuit court then concluded that:

> By the time the defendant invoked his right to counsel in this case, the investigators were sufficiently focused on him as a suspect that his right to counsel had attached. Once that right is invoked, questioning must cease. Any statement of the defendant on September 4–5, 2006,[4] after the invocation of the right to counsel is suppressed.

With respect to the voluntariness of this statement, the circuit court found that those portions of this statement "prior to the invocation of the right to counsel, and which are otherwise admissible . . . , did not require the giving of *Miranda* rights

---

4. The transcript of the 09.04.06 11:15 interview reveals that the interview concluded at 1:10 a.m. on September 5, 2006.

prior to the statement, and that portion of the motion to suppress is denied."

The circuit court next addressed the 09.28.06 4:45 interview. Noting that this interview was preceded by the admonishment and completion "of a *Miranda* rights and a signed waiver," the circuit court found that the interview occurred after Osburn's arrest for Casey's murder, "so it was custodial without question." It then found that the statement should be suppressed, in that the State made no showing that Osburn had initiated the contact with police leading up to the statement. Specifically, the circuit court found that the officers who took the statement failed to even acknowledge Osburn's prior exercise of his Fifth Amendment right to counsel and proceeded as if it had not occurred.[5]

As to the 09.28.06 7:25 interview, the circuit court reviewed the videotape of the interview and found that Osburn appeared calm and relaxed. It then found that Osburn had initiated further contact with police after invoking his right to counsel:

> The court finds that the defendant did in this particular statement evince a willingness or desire for generalized discussion about the investigation, when he said to Agent Boshears, "I am in a mess." The further conversation between the defendant and Boshears from that point led eventually to the defendant stating he wanted to talk further about the situation and "do the right thing."

It further found that the statement was knowingly, intelligently, and voluntarily

made and denied Osburn's motion to suppress it.

Finally, with respect to the 09.28.06 8:55 interview, the circuit court found that Osburn initiated the conversation with then-Sheriff-Elect Snyder and that his statements were knowingly, intelligently, and voluntarily made. For these reasons, the circuit court denied Osburn's motion to suppress with respect to this statement.

At issue here are the two statements that the circuit court refused to suppress, the 09.28.06 7:25 interview and the 09.28.06 8:55 interview.[6] In reviewing a circuit court's refusal to suppress a confession, this court makes an independent determination based upon the totality of the circumstances. *See Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). The circuit court's ruling will only be reversed if it is clearly against the preponderance of the evidence. *See id.* Any conflict in the testimony of different witnesses is for the circuit court to resolve. *See id.* Here, Osburn challenges the circuit court's refusal to suppress the statements, claiming that his right to counsel was violated and that the statements were not voluntary, but coerced.

## A. *Violation of the Right to Counsel*

The Fifth Amendment right to counsel attaches during custodial interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). When an accused has invoked his right to have counsel present during custodial in-

---

5. In addition, the circuit court noted that Osburn "again in this interview renewed his exercise of his right to counsel at pages 49 and 53."

6. The State urges that while Osburn challenges two statements, only one was used against him at trial, and submits that because one of the statements was not used against

him at trial, he cannot now claim on appeal prejudice stemming from that statement. We disagree. Osburn has raised a fruit-of-the-poisonous-tree argument, in which he claims that the "fruit" of the "tree" was admitted erroneously. For that reason, we find it necessary to examine the "tree," despite the fact that it was not used against him.

terrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *See id.* Instead, an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *See id.* While the accused may initiate further contact with the police, the impetus must come from the accused, not the police. *See Metcalf v. State,* 284 Ark. 223, 681 S.W.2d 344 (1984). Because it is undisputed that Osburn invoked his right to counsel at the conclusion of the 09.28.06 4:45 interview, the question initially presented is whether Osburn initiated further communication with the investigators.

■ With respect to whether Osburn "initiated" for purposes of *Edwards v. Arizona, supra,* the circuit court found, in pertinent part:

The testimony from the State at the suppression hearing regarding this statement came from Rick Newton and Michael Boshears. Boshears['s] testimony was that after Osburn invoked his right to counsel in the prior interview, Rick Newton turned the tape recorder off and went outside the interview room to arrange for Osburn to be transported to Dumas Jail. Boshears was alone in the room with Osburn 5–10 minutes. Osburn requested of Boshears that he be allowed to see his family before he went to jail. Boshears responded that he would check with Newton to see if his request could be met.

Osburn then stated "I'm in a mess." Boshears responded that he relies on his faith in such circumstances. Osburn asked Boshears to pray for him. Boshears stated he would, and had already. Osburn became emotional, stating he wanted to see his daughter.

Boshears advised him to spend some time in prayer while he was in jail. Osburn explained he did not feel worthy, and had not been doing well in life. *Boshears asked if he wanted to keep talking.* Osburn said he wanted to do the right thing and talk. Boshears then opened the door and called Newton, telling him Osburn wanted to continue their conversation. Boshears['s] notes regarding this conversation were admitted by the Defendant for impeachment purposes as Defendant's Exhibit A. The Court does not find it to be substantially different from his testimony.

Newton's testimony was that about five minutes after the initial interview ended, and he went to arrange transportation for Osburn to the jail, Boshears came out and told him Osburn wanted to speak again and get it off his chest. He then went in and the tape of the interview shows Newton reviewing the *Miranda* rights form and waiver previously executed by Osburn. Osburn acknowledges the rights.

The Court has reviewed the interview in question. Osburn appears calm and relaxed. The only thing which makes him appear uncomfortable at any time during this interview appears to be the video camera.

The defendant argues that this statement should be suppressed because of the previous invocation of the right to counsel by the defendant. The states [sic] argues that the defendant initiated this further conversation with the police, thus waiving his fifth amendment right to counsel under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d

378 (1981). See *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), and *Vidos v. State,* 367 Ark. 296 [239 S.W.3d 467], 2006 Ark. Lexis 249 (2006).

Under *Michigan v. Jackson, supra,* a defendant "initiates" further contact with police by "evincing willingness, or desire for generalized discussion about the investigation." In the case of *Owens v. Bowersox,* 290 F.3d 960 (8th Cir.2002), cited by the defendant, the court focused on this element, stating the impetus therein came from the defendant, through his mother, who told the police he wanted to talk to them, and not from suggestion by the police which coached the defendant into prompting the defendant to talk to them.

The court finds that the defendant did in this particular statement evince a willingness or desire for generalized discussion about the investigation, when he said to Agent Boshears, "I am in a mess." The further conversation between the defendant and Boshears from that point led eventually to the defendant stating he wanted to talk further

about the situation and "do the right thing."

(Emphasis added.)

■ ⌐₁₃In *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), which was a plurality decision, four justices held that the respondent's question, "Well, what is going to happen to me now?," "'initiated' further conversation in the ordinary dictionary sense of that word." 462 U.S. at 1045, 103 S.Ct. 2830. Justice Rehnquist, writing for the four, further observed that while a "bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue,"[7] the respondent's question "evinced a willingness and a desire for a generalized discussion about the investigation."[8] *Id.* at 1045–46, 103 S.Ct. 2830.

■ What is clear from *Bradshaw* is that in order for an accused to initiate, his inquiry or ⌐₁₄statement must indicate some desire or willingness to discuss the investigation. Here, the interaction between Osburn and Agent Boshears began with Osburn's inquiry as to whether he could see his family before being taken to jail. Agent Boshears, after telling Osburn that

---

**7.** Specifically, inquiries "such as a request for a drink of water or a request to use a telephone ... are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." 462 U.S. at 1045, 103 S.Ct. 2830.

**8.** Justice Powell, concurring, observed that the opinions in *Bradshaw* "reflect the ambiguity of some of the *Edwards* language, particularly on the meaning of 'initiation.'" 462 U.S. at 1048, 103 S.Ct. 2830 (Powell, J., concurring). He then agreed with Justice Rehnquist's conclusion that "the facts and circumstances, when viewed in their entirety, clearly establish a valid waiver of the right to counsel." *Id.* at 1050, 103 S.Ct. 2830 (Powell, J., concurring). Justice Marshall, leading the

four dissenting justices, interpreted *Edwards v. Arizona, supra,* as follows:

> When this Court in *Edwards* spoke of "initiat[ing] further communication" with the police and "reopen[ing] the dialogue with the authorities," it obviously had in mind communication or dialogue *about the subject matter of the criminal investigation.* The rule announced in *Edwards* was designed to ensure that any interrogation subsequent to an invocation of the right to counsel be at the instance of the accused, not the authorities. 451 U.S. at 485, 101 S.Ct. at 1885. Thus, a question or statement which does not invite further interrogation before an attorney is present cannot qualify as "initiation" under *Edwards.*

*Id.* at 1053–54, 103 S.Ct. 2830 (Marshall, J., dissenting) (emphasis in original).

that was not his decision, according to his own testimony, began to describe to Osburn what was about to happen and what Osburn could expect. Again, Osburn asked to see his family, and, again, Agent Boshears told him that he would ask.

It was at that point that Osburn simply made the statement that he was "in a mess," which the State claims constituted an initiation of contact with the police. However, we think it is clear that such a statement could have a variety of meanings, as evidenced by Agent Boshears's testimony that he too had found himself "in a mess":

> And I explained to [Osburn] that during times that I have, that I would call myself in a mess or tough times, I explained that I rely heavily on my faith and pray a great deal.

Here, Osburn's statement simply did not indicate any desire on his part to reengage in a discussion of "the investigation," as required by *Bradshaw*. Indeed, the conversation did not turn to the investigation, but instead, according to Agent Boshears's testimony, it turned to prayer, Osburn became emotional, and he again asked to see his daughter. The two began to speak about faith, to which, according to Boshears, Osburn stated that he did not feel worthy "to keep the faith" or his "relationship with Christ." Then, Agent Boshears, according to the circuit court's findings, "asked if [Osburn] wanted to keep talking."[9] It was only at that time that Osburn stated that he wanted to do the right thing and talk, and the statement at issue resulted.

After examining the totality of the circumstances, as we must, we simply cannot say that Osburn initiated further contact as contemplated by *Bradshaw*. Absolutely no inquiry or statement made by Osburn evinced any willingness on his part to reengage or reinitiate a conversation relating to the investigation; to the contrary, his inquiries and statements indicated a desire to see his family and expressed his despair. Nor did Osburn's statement that he was "in a mess" initiate. As the Supreme Court of Illinois stated, "To ascribe such significance to this limited [statement] would render virtually any remark by a defendant, no matter how offhand or superficial, susceptible of interpretation as an invitation to discuss his case in depth. To do so would amount to a perversion of the rule fashioned in *Edwards* and articulated more fully in *Bradshaw*." *People v. Olivera*, 164 Ill.2d 382, 390, 207 Ill.Dec. 433, 647 N.E.2d 926, 930 (1995).

Indeed, the only statement made by Osburn that indicated any willingness to discuss the investigation after his invocation of the right to counsel came *after* Agent Boshears asked him if "he wanted to keep talking." Here, counsel was not made available to Osburn, nor did he initiate; instead, it appears from the totality of the circumstances that the 09.28.06 7:25 interview was the result of a violation of *Edwards*. Accordingly, we hold that because Osburn did not initiate, his Fifth Amendment right to counsel was violated

---

9. While Agent Boshears testified that Osburn asked him if he wanted to continue talking to Osburn, Agent Boshears's report of the investigation stated that after Osburn again inquired whether he could see his mother and his daughter, Boshears "told him again that we would try to accommodate him and that if he wanted to talk more, we had time and would listen." Despite the contradiction, the circuit court clearly found that "Boshears asked if [Osburn] wanted to keep talking." Credibility determinations are for the circuit court to determine, *see Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504 (2007), and, we cannot say that the circuit court's finding on this issue was clearly against the preponderance of the evidence.

by the 09.28.06 7:25 interview, and the circuit court's finding to the contrary was clearly against the preponderance of the evidence.

■ We turn then to Osburn's claim that the illegality of the 09.28.06 7:25 interview rendered the 09.28.06 8:55 interview "fruit of the poisonous tree." "The doctrine requiring courts to suppress evidence as the tainted 'fruit' of unlawful governmental conduct had its genesis in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); there, the Court held that the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Nix v. Williams,* 467 U.S. 431, 441, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). "*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), extended the exclusionary rule to evidence that was the indirect product or 'fruit' of unlawful police conduct, but there again emphasized that evidence that has been illegally obtained need not always be suppressed." *Id.* Further, the fruit-of-the-poisonous-tree doctrine has not been limited to cases in which there has been a Fourth Amendment violation, but has also been applied to violations of the Sixth Amendment and the Fifth Amendment. *See id.*

While some courts have relied upon the United States Supreme Court's decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), to reject the application of the fruit-of-the-poisonous-tree doctrine to a Fifth Amendment violation of the right to counsel,[10] we disagree with their interpretation of that decision. In *Elstad,* the Court examined whether an initial failure of law enforcement officers to administer *Miranda* warnings, without

more, "tainted" subsequent admissions made after one was fully advised of and had waived his *Miranda* rights. The Court held that it did not:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

470 U.S. at 309, 105 S.Ct. 1285. In so holding, however, the Court drew a distinction between a procedural *Miranda* violation and a constitutional violation:

> Respondent's contention that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as "fruit of the poisonous tree" assumes the existence of a constitutional violation.

⎯⏌₁₈ . . . .

The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.* Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has

---

10. See, for example, *Howard v. Moore,* 131 F.3d 399 (4th Cir.1997), and *Greenawalt v.*

*Ricketts,* 943 F.2d 1020 (9th Cir.1991), as opposed to the cases relied upon herein, *infra.*

suffered no identifiable constitutional harm.

. . . .

Justice BRENNAN cannot seriously mean to equate such situations with the case at bar. Likewise inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent or to have counsel present were flatly ignored while police subjected them to continued interrogation.

*Id.* at 305, 306–07, 312 n. 3, 105 S.Ct. 1285 (internal citations omitted) (emphasis in original).

We have previously recognized that a procedural *Miranda* violation is not necessarily a violation of the Constitution, and the "fruits" doctrine may not be applicable. *See Childress v. State,* 322 Ark. 127, 907 S.W.2d 718 (1995) (rejecting, in accord with *Elstad,* appellant's claim that his unwarned, initial noncustodial statement tainted two later custodial statements). However, we are of the opinion that "there is a critical difference between a mere defect in the administration of *Miranda* warnings 'without more' and police-initiated interrogation conducted after a suspect unambiguously invokes the right to have counsel present during questioning," as "[t]he latter is a violation of a constitutional right." *State v. Harris,* 199 Wis.2d 227, 248, 544 N.W.2d 545, 553 (1996); *see also State v. Hartley,* 103 N.J. 252, 273, 277, 511 A.2d 80, 91, 93 (1986) ("Therefore, if after a suspect avails himself of the Constitution's protections the police violate a right that has been invoked, that violation, by definition, is of constitutional magnitude. . . . [O]nce it has been determined that there has been a failure to honor the previously-invoked right [to counsel or right to silence], the resultant violation cannot be anything other than a constitutional infringement."). As the Wisconsin Supreme Court has observed,

there is a very clear distinction between the violation of a procedure and the violation of a right:

The primary flaw in the State's argument is the failure to distinguish between violation of a procedure (informing an accused of his rights) and violation of a right (the right to have counsel present during interrogation). The procedure required under *Miranda* is that warnings must be given prior to custodial interrogation, while the procedure required by *Edwards* is that once a suspect invokes the right to counsel, all police-initiated questioning must cease until counsel is present. With the former, it is possible to act in a manner that is violative of the safeguard but not of the rights it seeks to protect; this is not possible with conduct that violates *Edwards.* A violation of *Edwards* is a violation of the right to counsel under the Fifth Amendment.

*Id.* at 247, 544 N.W.2d at 553.

In the instant case, Osburn's Fifth Amendment right was violated; as such, this Fifth Amendment violation "triggers the fruit of the poisonous tree doctrine requiring the suppression of the fruits of that constitutional violation." *Id.,* 544 N.W.2d at 553; *see also Smith v. State,* 132 Ga.App. 491, 208 S.E.2d 351 (1974) (holding that where appellant's first statement was inadmissible due to the State's failure to show a waiver of his right to counsel, and where the State did not demonstrate that appellant's subsequent confessions were obtained by means sufficient to purge the underlying illegality, appellant's subsequent confessions were tainted by the first, pursuant to *Wong Sun* ). However, "[j]ust as the 'fruit' of a Fourth Amendment violation need not, under all circumstances, be suppressed, a confession that follows a Fifth Amendment

violation is not, under all circumstances, barred from use as evidence." *State v. Vinson*, 854 S.W.2d 615, 622 (Mo.Ct.App. 1993). With respect to the fruit-of-the-poisonous-tree doctrine, the pertinent inquiry is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. U.S.*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The question, then, is whether Osburn's statement from the 09.28.06 8:55 interview was an exploitation of the 09.28.06 7:25 interview or whether it was sufficiently distinguishable such that any taint was purged.

Under the facts of this case, we are simply unable to say that Osburn's statement from the 09.28.06 8:55 interview did not come by exploitation of the illegality of the 09.28.06 7:25 interview. As the United States Supreme Court observed in *United States v. Bayer*:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947).[11] Certainly, where the illegal statement was made at 7:25 p.m. and concluded at 7:35 p.m., and the subsequent confession was taken at 8:55 p.m., just one hour and twenty minutes later,

Osburn was in no way free of the psychological and practical disadvantages of having had confessed. In addition, Osburn was in continuous custody between the two statements, and the same two investigators participated in both. While Osburn was taken to a different location between the two statements and was permitted a fifteen-minute visit with his family, he had no consultation with counsel, and, in fact, was ushered into the latter statement by his friend and former employer, the then-sheriff-elect.

We have held that when the original confession has been made under illegal influences, such influences will be presumed to continue and color all subsequent confessions, unless the contrary is shown. *See Weaver v. State*, 305 Ark. 180, 806 S.W.2d 615 (1991). The contrary has not been shown. Accordingly, we hold that the 09.28.06 8:55 interview was a fruit of the earlier 09.28.06 7:25 interview and should have been suppressed.

### B. Coercion

■ Notwithstanding the foregoing analysis, even were the United States Supreme Court to determine that a violation of *Edwards* is not a constitutional violation, our disposition of this case would not change. This is so, because after reviewing the totality of the circumstances, it is abundantly clear to this court that Osburn's statements were the result of coercion and in violation of his Fifth Amendment right.

■ A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a cus-

---

11. The Court continued that it had "never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Bayer*, 331 U.S. at 540–41, 67 S.Ct. 1394. We do not disagree.

todial statement was given voluntarily and was knowingly and intelligently made. *See Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *See id.* To make this determination, we review the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *See id.* Again, we will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *See id.* Here, Osburn argues that his confessions were the product of intimidation, coercion, and deception, citing to multiple statements made by investigators in his earlier interviews, which he claims were threatening and regarded the death penalty and his family. We agree.

■ We have previously held, in determining whether a statement was the product of coercion, that it must be demonstrated that the activity of the police had a particular effect upon the accused. *See Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004). In other words, "there must be an 'essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other.'" *Id.* at 122, 161 S.W.3d at

824 (quoting *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired. *See id.*

■ Many of the investigators' statements that Osburn alleges were threatening, and, therefore, coercive, were made during the 09.04.06 11:15 interview.[12] While some of the statements could indeed be described as threatening, the record reveals that they were made twenty-four days prior to the interview at issue. We cannot say that there was an essential link between the coercive behavior of the police and the resulting confession of the accused. The 09.28.06 interviews took place twenty-four days after the alleged threats were made to Osburn, which we believe was enough time to avoid any effects of the coercive statements. *See Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997) (holding that, to the extent it could be argued that two police-initiated contacts after the appointment of counsel were an attempt at repeated questioning designed to wear down appellant's resistance or change his mind, the five-day gap between the contacts and his statement at issue served to avoid the effects of repeated questioning).

The same cannot be said, however, with respect to the tactics used and statements made by Agents Newton and Boshears during the 09.28.06 4:45 interview, which concluded just before the 09.28.06 7:25 interview. Our review of the record reveals that during the 09.28.06 4:45 interview, conducted at a metal outbuilding located on the then-sheriff-elect's property, the interrogating agents immediately be-

---

12. Some of the statements relied upon by Osburn include him being told of "last meals," that the jury would "cook [his] ass," and that "they're going to pump the needle in [his] arm." In addition, at the conclusion of the 09.04.06 11:15 interview, Agent Newton told Osburn that the next time they met, he would only be nice for a short time and, then, "I'm going to get ugly."

gan using Osburn's concern and love for his family to coerce him into making a confession. Immediately after having read Osburn his *Miranda* rights, but prior to his signing his *Miranda* rights form, the agents seized upon Osburn's concern for his daughter, ironically, after stating that they were not threatening him:

AGENT BOSHEARS: Yeah, Kenny, you know we're not threatening you by any means.

OSBURN: No. But why—

AGENT BOSHEARS: We don't want you think anything like that (sic).

OSBURN: Why—But why is it about my daughter?

AGENT BOSHEARS: Well, we're—

AGENT NEWTON: We're going to get into that.

AGENT BOSHEARS: We're going—

OSBURN: Because she ain't—

AGENT BOSHEARS: And you know what, after we talk, we're probably going to call those guys and, and tell those guys to let her loose.

AGENT NEWTON: Cut her loose. Okay?

AGENT BOSHEARS: Does that work for you? We'll call up there and, and we'll get her cut loose. We'll let you talk to her. We'll get you on the phone with her. If you want to, we'll even bring her up here, if you want to do that. You want us to do that?

OSBURN: Yeah, bring her up here.

AGENT BOSHEARS: Okay. We'll—

AGENT NEWTON: After we're done, yeah. We'll bring her and Kenny Jr. and your mom and daddy.

AGENT BOSHEARS: Anybody you want us to bring up here, Kenny, we'll do that for you.

The agents *then* asked Osburn to sign his *Miranda* form. Only seven pages later, the agents again brought up Osburn's family in their questioning:

AGENT NEWTON: Since your wife died, what a year ago, Kenny?

OSBURN: Uh-huh. It was February 20th.

AGENT NEWTON: Oh-five?

OSBURN: Yeah. About a year and a half.

AGENT NEWTON: Holly and Kenny Jr. is your life (sic). Isn't it?

OSBURN: They're my life.

AGENT NEWTON: Ugh?

AGENT BOSHEARS: You want to take care of them. Don't you?

OSBURN: I try.

AGENT BOSHEARS: Well, apparently you do.

AGENT NEWTON: You do the best you can today, trying to raise two kids. Don't you?

OSBURN: Right.

AGENT NEWTON: The best you can.

During the course of the interview, Osburn maintained his innocence, and the agents continued to reference Osburn's family:

AGENT BOSHEARS: Kenny, I think what Rick's trying to say here and I'm sorry to interrupt, Kenny. He wants to give you an opportunity to really tell us everything—

OSBURN: I am.

AGENT BOSHEARS: And not, not just oh, I remember doing this. And Kenny, we've, we've got to be able to help you here but you've got to help us. And I truly, sincerely mean that to you, Kenny. And, and we're no different than you are. We identify with you, we've got families.

I know your daughter and your son are important to you. And they're what you care about and they're what you care about right now but we care about

the truth. And your son and your daughter want, I think the truth of all of this. And you want, I think, you know in your mind the truth is best in this situation, so I want you to Rick (sic) and what Rick is trying to say is Kenny, we want you to help us and help yourself and help your family by proving (sic) us the full truth.

After informing Osburn that a witness had seen him with someone else in his truck, they again referenced Osburn's daughter:

OSBURN: Wasn't nobody in there with me.

AGENT NEWTON: What did I tell you out there? What did I tell you out there? We have our homework. We've got the cameras. We've got the eyewitness that saw you with somebody.[13] Your daughter's even admitted now to that witness, Kenny, that will be put on the witness stand. And your daughter—

AGENT BOSHEARS: You're dragging your daughter—

AGENT NEWTON: You're going to drag your daughter in this. You're going to wind up dragging your daughter through the mud.

AGENT BOSHEARS: We're trying to save Kenny Jr.—

AGENT NEWTON: Because that woman—

AGENT BOSHEARS: Your daughter and your son embarrassed (sic). We don't want to embarrass you.

AGENT NEWTON: Your daughter specifically, this witness told your daughter, when the witness said, "I just saw your daddy and Kenny heading towards the river." And said Holly had the weirdest look on her face and said, well, daddy

couldn't have made it home by then to pick up Kenny. Do you know what that's going to do to Holly?

AGENT BOSHEARS: Kenny, we don't want to—

AGENT NEWTON: We don't want that to happen.

AGENT BOSHEARS: We don't want you to be embarrassed. We don't want your son to be embarrassed. And we, we're trying to help salvage this whole situation where it is not damaging to your family and we can, we can help them in this situation. And, and take care of them and then you've got our word that we'll do that.

When Osburn denied that anyone was in his truck, the coercion continued:

AGENT BOSHEARS: Kenny, the evidence, the evidence says something different. And, and we've done our work, we really have, Kenny. I'm, and, and honestly, I've talked to Rick, we've been talking about this for a few days and I said you know when we met Kenny, Kenny's not a bad guy, Rick. We've got to be able to communicate with him in a way that he understands what we are trying to do to help him, to help his family.

Because I've got a daughter myself and I care about her so much, and I would not want to put her through something like this. And I would do whatever it took to, to protect her. And it, it, I mean, it hurts my heart to think of, of that if I had to put my daughter through that I would want to minimize her exposure and what she's going to have to go through for something I'd

13. The witness told investigators that after seeing Osburn, she arrived at the nursing home at which Osburn's daughter was working, saw his daughter, and mentioned to her that she had seen Osburn and his son. The witness said that Osburn's daughter told her that there was no way that her brother could have been in the car, as Osburn had just dropped her off and had not had the time to go get her brother and have been where the witness saw him.

did. And for something, something that was my fault and not her fault. And I would never want to put on her or my boys and let them be at fault for something that I'm responsible for. And, and we can help in that situation.

. . . .

AGENT BOSHEARS: Kenny, would you want your daughter to have to take the witness stand in something like this? Or your son?

OSBURN: No, I don't.

AGENT BOSHEARS: Or your mom or your dad? You don't want to put them through that. Kenny, you're familiar with—

Soon thereafter, Osburn relayed to the agents that he was tired,[14] and, yet again, the agents used Osburn's children in an attempt to keep him talking, as well as threats regarding their ability to help Osburn and his family:

OSBURN: Well, right now, I'm just so tired and wore out.

AGENT BOSHEARS: You want us to get your daughter up here?

OSBURN: Can I sleep tonight and talk to y'all tomorrow or whatever?

AGENT NEWTON: Kenny—

AGENT BOSHEARS: We want to let you get some rest, and we'll let you get some rest. And we'll get your daughter up here.

OSBURN: I've got to get my mind rested or I can't really talk. I'm just that wore out.

AGENT BOSHEARS: Kenny, I'm that wore out too. Rick you wore out?

AGENT NEWTON: Yeah. I'm wore out. But I'm going to tell you this Kenny, once we're finished with you here today, you know, we can't come back tomorrow.

AGENT BOSHEARS: That's right. And I want, I want—

AGENT NEWTON: There is, there is no tomorrow for us. We can't help you or we can't do anything that needs to be done for you or Holly or Kenny Jr. after tonight. We can't, our hands are tied by law. We can't do it Kenny. we cannot.

AGENT BOSHEARS: We can help you but when we walk out this door we can't help you any more.

AGENT NEWTON: We're done. By law we cannot.

AGENT BOSHEARS: Rick has been concerned about you from the very night he's met you. He's called on me and told me you'd called him and been in contact with him, that you were sick to your stomach and having trouble sleeping. And you know what? That man has called me worried about you. And that tells me, I mean, he cares about you. You know what, we care about you and you care about your kids and we care about your family. We can, we can do this quietly. We can do it in a way you want to do it. I can get your daughter up here, if you want to talk to them when we're done. Kenny, I think you want to bring an end to this too because you haven't had any sleep and it's been on your mind. I know it's been on your mind since the last time we talked to you. Hasn't it? Hasn't it?

OSBURN: Yeah. I've been pretty stressed.

AGENT BOSHEARS: I know you have. And I hate that for you. I, I know you have. And it's stressed out your daughter. And it's stressed out your son. And it's stressed out your mama. Cause she's come up there worried about you. We've talked to her.

14. It appears from the record that Osburn, who was employed as a truck driver, was arrested immediately after his return from a job.

AGENT NEWTON: Kenny, right now Boyd and I cannot document it to help you and to help Holly and Kenny Jr. if we don't do it today. We can't.

AGENT BOSHEARS: We've got to be able to go to other law enforcement and be able to tell them our recommendation and what we, what our plans are to help you and help Holly to minimize this. And, and get you taken care of and get your children taken care of and we'll do that. But you've got to help us, Kenny.

And again:

AGENT BOSHEARS: And I know it's tough for us to have to bring this back up again and I know you don't want to have to relive, you don't want to rethink about it again, but in order for us to tell your story, you've got to help us tell it first.

AGENT NEWTON: On what went wrong. This is the helpful part for Kenny, Holly, and Kenny Jr. This is the helpful part, Kenny. Out of everything, partner. Look at me. Out of everything, everything that's been compiled, this one thing we're talking about right now, is one thing that is the helpful part to you and to Holly—

AGENT BOSHEARS: That's right.

AGENT NEWTON: and Kenny Jr.

AGENT BOSHEARS: And your mom.

AGENT NEWTON: Your mom and your dad. This one part right here, that's it. This is just the one part. I have no idea—your daughter and your mama and your daddy.

AGENT BOSHEARS: Just, just start off where, where it went wrong, Kenny. And just lead us down the road and tell us your story.

At that point, Osburn asked the agents to call his lawyer and told them that "the girl ain't been in my truck."

However, instead of ceasing the interview,[15] the agents continued to use Osburn's concern for his family to coerce a statement from him, making such comments as:

AGENT BOSHEARS: Kenny, we want to help you to be able to tell your story. And we want your daughter and your son and your mom not to have to go through the pain that this may cause.

. . . .

AGENT BOSHEARS: Kenny, I think you're a man that wants to make things right in life. I can see that in the way of the relationship with your daughter from what I've known about it and what I've seen.

After Osburn continued to deny even knowing who Casey was until he had seen the posters regarding her disappearance, the agents repeated to Osburn that they knew Casey had been in his truck, asking if he was protecting someone else, specifically, his son:

AGENT NEWTON: We've accounted for Holly's whereabouts. Is it Kenny Jr.?

AGENT BOSHEARS: Are you, are you protecting your son?

OSBURN: Well, he don't drive my truck.

AGENT NEWTON: He's we're not saying he's driving your truck. We're saying—

OSBURN: He was at home in bed asleep.

AGENT NEWTON: Okay.

AGENT BOSHEARS: Well, do you want us to rule him out? Did you—Is there somebody else, Kenny, that you're trying to protect? That you loaned your

---

15. As already stated, both Agent Newton and Agent Boshears testified that they did not hear Osburn's first request for an attorney in the 09.28.06 4:45 interview. Yet, then-Sergeant Michael Todd Daley testified that Agent Newton admitted to him that he had questioned Osburn after Osburn had asked for a lawyer.

truck to or that you dropped that girl off at their house?

Osburn then requested, again, that the agents call his lawyer, and the interview was terminated. According to Agent Newton's testimony at the suppression hearing,[16] he then went to arrange transportation, and the conversation between Osburn and Agent Boshears, ▮₃₃as previously set forth in this opinion, occurred.

▮▮▮▮▮ Threats to arrest family members can render a subsequent confession involuntary. *See People v. Weaver*, 26 Cal.4th 876, 29 P.3d 103, 111 Cal.Rptr.2d 2 (2001) (citing *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); *People v. Matlock*, 51 Cal.2d 682, 336 P.2d 505 (1959)). Viewing the totality of the circumstances, it is clear that Osburn's statement resulting from the 09.28.06 7:25 interview was not voluntary. Coercion can be mental, as well as physical. *See Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "[C]ustodial police interrogation, by its very nature, isolates and pressures the individual[;] . . . 'even without employing brutality, the "third degree" or other specific stratagems, . . . custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.'" *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147

L.Ed.2d 405 (2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 455, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

In *Haynes v. State of Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), Haynes alleged that

during the approximately 16–hour period between the time of his arrest and the making and signing of the written confession, he several times asked police to allow him to call an attorney and to call his wife. He said that such requests were uniformly refused and that he was repeatedly told that he would not be allowed to call unless and until he "cooperated" with police and gave them a written and signed confession admitting participation in the robbery.

373 U.S. at 504, 83 S.Ct. 1336. The United States Supreme Court observed that it was not denied that detectives "had told the petitioner that he might call his wife only if he 'cooperated' and gave the police a statement"; that a detective "said merely that he could not 'remember' whether Haynes had asked to call his wife"; and that "[h]e conceded that the petitioner 'could have' ▮₃₄made such a request." *Id.* at 509–10, 83 S.Ct. 1336. The Court stated that it could not "but attribute significance to the failure of the State, after listening to the petitioner's direct and explicit testimony, to attempt to contradict that crucial evi-

---

**16.** From our review of the record, we merely make note that at the suppression hearing, the State inquired of Agent Newton as to what he did after Osburn invoked his right to counsel, to which Agent Newton responded:

I took it as if he might have already had a lawyer or y'all call me a lawyer, whatever. I wasn't going to try to speculate what he meant, so I ceased the interview at that point and told him, fine, we're not going to violate your constitutional rights.

Yet, at trial, Agent Newton testified on direct examination, when called by the defense, that after "the first audiotaped interview," which was the 09.28.06 4:45 interview, Osburn was:

still sitting in the chair with Agent Boshears in the room with him. I open the door. I open my phone, dial a number, put the phone up there, and I said, Ken, referring to Agent Ken Whitmore, I said, looks like nothing is going to develop here. If you haven't heard from me in twenty minutes, do what you've got to do.

Because this evidence was not presented to the circuit court during the suppression hearing, however, it is not for our consideration on this point.

dence; this testimonial void is the more meaningful in light of the availability and willing co-operation of the policemen who, if honestly able to do so, could have readily denied the defendant's claims." *Id.* at 510, 83 S.Ct. 1336.

The State argued that Haynes's answers to certain questions "conclusively negative[d] existence of coercion or inducement on the part of police"; but the Court disagreed, stating that "[t]he questions on their face disclose that the petitioner was told that 'booking' was a prerequisite to calling his wife, and 'booking' must mean booking on a charge of robbery." *Id.* at 512, 83 S.Ct. 1336. The Court then held:

> The uncontroverted portions of the record thus disclose that the petitioner's written confession was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities.... Haynes' undisputed testimony as to the making and signing of the challenged confession used against him at trial permits no doubt that it was obtained under a totality of circumstances evidencing an involuntary written admission of guilt.
>
> . . . .
>
> Neither the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negatives the existence and effectiveness of the coercive tactics used in securing the written confession introduced at trial. The petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands. Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family Haynes understandably chose to make and sign

the damning written statement; given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will[.]

*Id.* at 514, 83 S.Ct. 1336.

While Osburn did not testify at the suppression hearing as the defendant did in *Haynes,* there was no need. The transcript and recording of the 09.28.06 4:45 interview adequately demonstrate an interview replete with evidence of coercion. Indeed, there is no dispute that the transcripts of the statements in this matter are accurate, and we simply cannot ignore the blatant coercion that occurred.

The State urges that there is no evidence that Osburn's waiver of rights resulted from or was influenced by the coercive statements. We disagree. As in *Haynes,* Osburn was repeatedly pressured in a coercive context to provide a confession. Osburn finally succumbed to that pressure, but only after the agents had essentially "dangled" his ability to see and protect his family in front of him time and time again. We simply cannot ignore the coercive statements in the interview itself, nor the statements by Agent Boshears during his conversation with Osburn following his invocation of the right to counsel and prior to the 09.28.06 7:25 interview, which continually suggested to Osburn that he might not be able to see his family or that his daughter might be arrested, unless he confessed. As the Court observed in *Haynes:*

> We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects. Of course, detection and solution of crime is, at best, a difficult and ardu-

ous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. But we cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated. We are here impelled to the conclusion, from all of the facts presented, that the bounds of due process have been exceeded.

373 U.S. at 514–15, 83 S.Ct. 1336.

Here, it is clear that Osburn's will was overborne by the coercive tactics used during the entirety of the interview process following his arrest.[17] Accordingly, we are of the opinion that the circuit court's finding that Osburn's statement resulting from the 09.28.06 7:25 interview was voluntarily made was clearly against the preponderance of the evidence. We further hold that because Osburn's 09.28.06 8:55 statement was quite clearly a fruit of the 09.28.06 7:25 interview, it too should have been suppressed.

Again, the two statements were only slightly separated in time, Osburn was transported from the metal outbuilding to the SEALEC by Agent Newton, one of the two investigators involved in the coercive interview, and he was only briefly permitted to visit with his family. He was then further interviewed by the same two agents, as well as his friend and former employer, then-Sheriff-Elect Snyder. Moreover, as we have already stated, Osburn was not free of the psychological and practical disadvantages of having already confessed. With all of these factors in mind, we simply cannot say that the taint of the 09.28.06 7:25 interview was in any way attenuated. For these reasons, we hold that the circuit court's findings that Osburn's 09.28.06 7:25 and 09.28.06 8:55 statements were voluntary were clearly against the preponderance of the evidence, and we reverse and remand Osburn's convictions and sentence.[18]

## II.  404(b)

For his second point on appeal, Osburn argues that the circuit court erred

---

17. Arguably, the investigators' coercive tactics even continued into the 09.28.06 8:55 interview. After the review of his rights, Agent Boshears made the following statement:

> Hey, Kenny, Special Agent Newton and myself and you visited for, before this at a different location, we came here and you met with your mother and you met with your daughter and some other family members. And we're kind of concluding the evening and the time that we've spent together. And you indicated that you wanted to talk with Jim [the then-sheriff-elect] here for a little while and so Rick and myself said, you know, that would be fine.

> We want, we want you to have that opportunity and Jim, I think, wants to ask you a few questions. So really, at this time, I'm just going to kind of back out and let Jim and you talk. *Just so we're clear, you know, the air and your friendship and relationship with him that, you know, you can just kind of explain what you want to explain. It's just us in here.* So, Jim, I, you know— (Emphasis added.)

18. Because we reverse and remand for the reasons above, we do not address Osburn's claim regarding promises of leniency.

in admitting the testimony of Connie Sparks regarding a twenty-seven-year-old incident, which the State claimed was admissible pursuant to Ark. R. Evid. 404(b).[19] Osburn urges that because of the numerous dissimilarities between the instant case and the Sparks incident, the testimony was inadmissible. He further asserts that the evidence was more prejudicial than probative and was, therefore, inadmissible pursuant to Ark. R. Evid. 403. The State disagrees, maintaining that the similarities between the two incidents helped to demonstrate Osburn's intent, motive, and plan to commit kidnapping and that there was evidence of sexual motivation behind the attacks of both women. It further states that the probative value of Sparks's testimony outweighed any danger of unfair prejudice.

▆▆▆ Rule 404(b) specifically provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In analyzing the admission of evidence under Ark. R. Evid. 404(b), this court has stated that such evidence is not admissible simply to show a prior bad act. *See Rollins v. State*, 362 Ark. 279, 208 S.W.3d 215 (2005). To be admissible, the evidence must be independently relevant, which means it must have a tendency to make the existence of a fact of consequence to the determination of the case more or less probable. *See id.* It is well settled that the admission or rejection of evidence is left to the sound discretion of the circuit court and will not be reversed absent an abuse of discretion. *See id.*

In this case, the State presented the testimony of Connie Sparks. Ms. Sparks testified that in the early eighties, when she was about eighteen or nineteen years of age, her sister had been engaged to Osburn. She testified that, at the time, she lived in Dumas in the country. Ms. Sparks was married; however, her husband was a truck driver and was oftentimes away. Ms. Sparks testified that on one evening, Osburn came to her door, told her he had car trouble, and asked if she could take him to his car.

She testified that she drove her car with Osburn to the Arkansas River levee and that, when she got there, she did not see anything. She testified that they got out of the car, and, at that time, Osburn grabbed her by the throat, started ripping at her clothes, and grabbing her breasts. She testified that he started to get into her pants, but that she was able to kick him in the groin, get away, and return to her home. A review of the record reveals that Osburn did not cross-examine Ms. Sparks.

▆▆▆ In ruling on the admissibility of Ms. Sparks's testimony, the circuit court found:

And looking at the facts in this, there's some similarities. Both these women were alone at the time the Defendant is alleged to have encountered them, although in different circumstances, one at her home and one on the side of the road.

There was an issue of help involved in both of them, one the prior victim where she was alleging that the Defendant wanted her to help him. Here the argument of motive or reason for the encounter would be for the victim to have the Defendant help her.

19. Again, we address this issue as it is likely to arise on retrial.

Arguably, the sexual motivation exists in both of these cases. In one, we know there's a physical struggle. In the other, there is circumstantial [40]evidence of such. In one, we know that the victim overcame the Defendant. In this case, if the Defendant committed the act that he was charged with, she did not. So that's a dissimilarity.

So under the circumstances, I think that it fits under 404(b) as a, evidence of motive, intent, and plan.

We have held that evidence of other crimes or bad acts are admissible to show intent. *See Davis v. State,* 362 Ark. 34, 207 S.W.3d 474 (2005). However, this court has recognized that to be probative under Ark. R. Evid. 403, the prior act must be similar to the crime charged. *See id.* In *Sasser v. State,* 321 Ark. 438, 902 S.W.2d 773 (1995), this court observed that

> [t]he degree of similarity between the circumstances of prior crimes and the present crime required for admission of evidence under Rule 404(b) is a determination that affords considerable leeway to the trial judge, and may vary with the purpose for which the evidence is admitted. *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 112, n. 4 and accompanying text (2d ed. 1994) ("To be probative, prior criminal acts must require an intent similar to that required by the charged crime, although it is usually said that the prior crime need not closely resemble the charged crime."); 1 John W. Strong, *McCormick on Evidence* § 190, n. 31 and accompanying text (4th ed. 1992) ("The similarities between the act charged and the extrinsic acts [admitted to show the act charged was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge] need not be as extensive and striking as is required . . . [to show *modus operan-*

*di* ]"). *See generally* 2 Jack B. Weinstein, et al., *Weinstein's Evidence* ¶ 404[12] (1995); 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 302 (Chadbourn rev.1979).

321 Ark. at 447, 902 S.W.2d at 778–79. Affording the circuit court the leeway to which it is entitled, we cannot say that the circuit court abused its discretion in admitting Ms. Sparks's testimony.

As Osburn claims, and as the State readily acknowledged to the circuit court, the [41]incident involving Ms. Sparks was remote in time, being twenty-plus years prior to the incident here. However, we have generally upheld remoteness determinations when the similarities between the alleged prior act and the charged offense tend to show an intent to commit the charged offense. *See Allen v. State,* 374 Ark. 309, 287 S.W.3d 579 (2008). Here, Osburn was charged with kidnapping "for the purpose of inflicting physical injury upon [Casey] or terrorizing [Casey] or engaging her in sexual intercourse, deviate sexual activity or sexual contact." He was also charged with capital murder that "in the course of (sic) furtherance of the commission or attempted commission of the offenses of rape and kidnapping, or in immediate flight therefrom, under circumstances manifesting extreme indifference to the value of human life, [he] did by strangulation cause the death of Casey Crowder, or with premeditated and deliberated purpose of causing the death of Casey Crowder, did cause her death." Clearly, Ms. Sparks's testimony was independently relevant with respect to Osburn's motive, intent, or plan in committing attempted rape. Moreover, as set forth by the circuit court in its ruling, the similarities between the alleged prior act and the charged offense tend to show Osburn's intent to commit the charged offense. For these reasons, the circuit court

did not abuse its discretion in admitting Ms. Sparks's testimony.

Nor did the circuit court abuse its discretion in admitting the evidence pursuant to Rule 403. Evidence of prior crimes, wrongs, or acts, even if admissible under Rule 404(b), will not be admitted if the admission of such evidence is substantially outweighed by the danger of unfair prejudice pursuant to Ark. R. Evid. 403. *See Henderson v. State,* 360 Ark. 356, 201 S.W.3d 401 (2005). The balancing of probative value against prejudice, under Rule 403, is a matter left to the sound discretion of the circuit court. *See Holman v. State,* 372 Ark. 2, 269 S.W.3d 815 (2007). The circuit court's decision on such a matter will not be reversed absent a manifest abuse of that discretion. *See id.*

Here, the circuit court ruled specifically regarding Osburn's Rule 403 objection:

> The question then becomes a 403, weighing test. And the question under 403 is whether the probative value is substantially outweighed by the prejudicial effect. Obviously, [Ms. Sparks's testimony] is prejudicial. There's no question about it. At the same time, looking at all the facts and factors in this case, the Court finds that it does not and will allow the testimony.

We do not disagree. Indeed, Ms. Sparks's testimony may have been prejudicial, as most 404(b) evidence is. However, the similarities between the two acts were clearly probative of Osburn's intent, motive, and plan, as theorized by the State's charges, and the probative value of Ms. Sparks's testimony was not outweighed by the danger of unfair prejudice. Therefore, we hold that the circuit court did not abuse its discretion in allowing Ms. Sparks's testimony.

With respect to Osburn's third point on appeal, we decline to address it as it was specific to Osburn's first trial and is not likely to arise on remand. Accordingly, we, for the reasons already set forth, reverse and remand Osburn's convictions and sentence.

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2009), the record in this case has been reviewed for all objections, motions, and requests made by either party, which were decided adversely to Osburn, and, except as stated herein, no prejudicial error has been found.

Reversed and remanded.

HANNAH, C.J., concurs in part and dissents in part.

BROWN and GUNTER, JJ., dissent.

JIM HANNAH, Chief Justice, concurring in part and dissenting in part.

I concur in the majority's conclusion that the statements should have been excluded. However, I dissent from the majority's conclusion that the alleged sexual assault on Connie Sparks constitutes evidence proving that Osburn murdered Casey Crowder twenty-seven years later.

According to the State, Osburn, just as he did with Sparks twenty-seven years before, got Crowder alone by use of a motor vehicle near a levee and sexually assaulted her. The State argued to the circuit court that as between the two assaults, "[t]he only difference being he's learned his lesson since then and decided not to leave them alive." Thus, the State argued to the circuit court that the evidence was admissible to show that Osburn was subject to a proclivity, in other words a character trait of sexually assaulting women, and that he acted in conformity with that character in sexually assaulting and killing Casey Crowder. However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show

that he acted in conformity therewith." Ark. R. Evid. 404(b). Thus, the evidence as offered by the State was not admissible under Rule 404(b).

Further, although the State argued to the circuit court that the similarity between the assault upon Sparks and the murder of Crowder was "somewhat striking," the evidence does not support the State's assertion. Sparks testified that in the early eighties, Osburn appeared at her door and asked her to drive him to where his car was stalled. She did so and, according to Sparks, as they got out of her car, Osburn grabbed her by the throat and began ripping at her clothes. Sparks testified that Osburn "touched my breasts and everything." She further testified that he "started trying to get in my pants." According to Sparks, she kicked Osburn in the groin, ending the assault. Sparks had known Osburn since childhood, and at the time of the alleged assault, Osburn was engaged to Sparks's sister. The assault on Sparks occurred in 1981.

In the present case, the evidence shows that Osburn did not know Crowder. Also, the evidence reveals nothing about events at the roadside where Crowder was killed. There is no evidence to show that Crowder was grabbed and sexually assaulted by touching the portions of her body. Crowder's body was fully clothed. The evidence in this case is that Crowder was strangled by use of a "zip-tie." Sparks testified that her throat was grabbed, not that she was strangled by use of a "zip-tie." Osburn was twenty-two when he was accused of assaulting Sparks and forty-six when he was accused of attempting to rape and murdering Crowder. The similarities are that the assault occurred near a levee and somehow involved a motor vehicle, and that the victims were female. There is no striking similarity as the State alleged.

"To be admissible, there must be a very high degree of similarity between the charged crime and the prior uncharged act." *McGehee v. State*, 338 Ark. 152, 171, 992 S.W.2d 110, 121 (1999). The degree of similarity in the present case is minuscule. The circuit court abused its discretion in admitting the evidence of the alleged prior sexual assault.

I also note that the evidence of Sparks's assault was combined with evidence of a tear in the crotch of boxer shorts Crowder was wearing as an outside garment to argue that Osburn attempted to rape her. The State told the circuit court that "the crotch in Casey Crowder's clothing was ripped out there as she laid on the side of a ditch bank." However, the State never offered any evidence to support the assertion. Officer Scott Woodward testified about photographs of Crowder's body that he stated revealed that there was a "tear where the material and the thread was actually torn apart." He testified further that the crotch of the boxer shorts had been "ripped apart." An objection to this characterization was sustained, and the circuit court instructed the jury that the "characterization that that's the way the hole occurred is stricken from the record and will be disregarded by the jury." How the hole occurred is anyone's guess. It could have been caused in an assault. The body suffered postmortem injury by animal activity, and that may have been the cause. The hole may have been from normal wear and may have been present before she was killed. Further, Crowder was wearing an undergarment beneath the boxer shorts, and no evidence was offered to show that the undergarment was also torn or that it showed any evidence of being disturbed by the person who murdered Crowder. The evidence offered by the state simply does not give rise to an inference that Osburn sexually as-

saulted Crowder. The assault on Sparks is too dissimilar, and nothing about the tear in the boxer shorts gives rise to an inference that she was sexually assaulted. However, the circuit court allowed the State to introduce the evidence and argue a sexual assault when the evidence simply did not support the argument. It caused the jury to resort to speculation and conjecture. Speculation and conjecture cannot support a jury verdict. *See Flowers v. State*, 373 Ark. 119, 282 S.W.3d 790 (2008). Such a conviction would be based upon evidence less than that required to show proof beyond a reasonable doubt and would violate due process under the Fourteenth Amendment. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Finally, the Sparks incident is too remote in time. The state acknowledged that the assault was "remote in time" but argued that the similarities were so striking that the evidence was admissible. Similarity is not enough. Where evidence is remote in time and unconnected to the charged crime, as in the present case, the evidence is not relevant. *See Abernathy v. State*, 325 Ark. 61, 925 S.W.2d 380 (1996). The evidence was remote in time, dissimilar to the charged crime, and unconnected to the charged crime. The circuit court clearly abused its discretion in admitting the evidence. This case should be reversed and remanded on admission of the evidence of the assault on Sparks under Rule 404(b).

ROBERT L. BROWN, Justice, dissenting.

The suppression of the 8:55 p.m. confession by the majority eviscerates the State's case against Osburn, making a retrial a remote possibility. While I agree wholeheartedly that involuntary confessions must be suppressed under our basic con-

stitutional principles, I take issue with the majority's analysis in this case. I disagree that Osburn did not reinitiate contact with the police. I further disagree that Osburn's will was overborne by the police agents' reference to his daughter, Holley, in an interrogation that took place four hours earlier. For these reasons, I would affirm.

a. *Right to Counsel*

In an analysis of whether Osburn reinitiated discussion with police agents and waived his right to counsel, the time line in this case is all important. At 4:45 p.m., there was a lengthy interrogation of Osburn by FBI Agent Boshears and CID Agent Newton. Toward the end of that session, Osburn asked for an attorney, and the questioning stopped. There was no confession made by Osburn.

Prior to the second interrogation of Osburn at 7:25 p.m., the circuit judge found that the following occurred:

[T]he defendant did in this particular statement [the 7:25 p.m. statement] evince a willingness or desire for generalized discussion about the investigation, when he said to Agent Boshears, "I am in a mess." The further conversation between the defendant and Boshears from that point led eventually to the defendant stating he wanted to talk further about the situation and "do the right thing."

Earlier, the judge had said in his order Osburn then stated, "I'm in a mess." Boshears responded that he relies on his faith in such circumstances. Osburn asked Boshears to pray for him. Boshears stated he would, and had already. Osburn then became emotional, stating he wanted to see his daughter. Boshears advised him to spend some time in prayer when he was in jail. Osburn explained he did not feel worthy, and

had not been doing well in life. Boshears asked if he wanted to keep talking. Osburn said he wanted to do the right thing and talk. Boshears then opened the door and called Newton, telling him Osburn wanted to continue their conversation. Boshears (sic) notes regarding this conversation were admitted by the Defendant for impeachment purposes as Defendant's Exhibit A. The Court does not find it to be substantially different from his testimony.

After the 7:25 p.m. confession, Osburn reinitiated contact with law enforcement a second time before the 8:55 p.m. confession, which is the confession that was presented to the jury in the State's case in chief. Here is what the circuit judge found transpired in connection with that confession:

> After the defendant's family members left, the defendant approached Mr. Snyder [deputy sheriff and sheriff-elect] and stated, "Jim that was not me that did that to that girl." Further conversation ensued, which led to Snyder calling in Agent Boshears and Rick Newton, and a further taped interview with defendant. Prior to this interview [8:55 p.m.], the defendant was given another *Miranda* rights statement and signed a waiver of those rights. He indicated he wanted to participate in the interview, which contains admissions.

The majority does not dispute that Osburn reestablished contact with law enforcement before the 8:55 p.m. confession and, thus, complied with the *Edwards* case. Rather, the majority argues that this confession was tainted by earlier events because it was fruit of the poisonous tree.

I see no violation of Osburn's right to counsel for the 8:55 p.m. confession. First, Osburn initiated contact with the police before the 7:25 p.m. confession, which the State did not use, and also did so before the 8:55 p.m. confession. Second, he was given his *Miranda* warnings before each confession and certainly knew what his right to counsel was, since he had asked for an attorney toward the end of his 4:45 p.m. interrogation.

It is a real stretch to hold, as the majority does, that Osburn could not change his mind three or four hours later about talking to the police without having counsel present. Certainly, the United State Supreme Court has acknowledged that this can occur. *See United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). And, yet, the majority concludes that the 8:55 p.m. confession, where no one disputes that Osburn initiated contact with Deputy Sheriff Snyder after visiting with his family, was irrevocably tainted. The facts simply do not support this conclusion.

The seminal case on the point of reopening dialogue with law enforcement after invoking the right to counsel is *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion).[1] In *Bradshaw,* the Court held that the defendant could reinitiate contact and that the defendant's comments must evince "a willingness and a desire for a generalized discussion about the investigation" and relate "directly or indirectly to the investigation." *Id.* at 1045–46, 103 S.Ct. 2830. Surely, that occurred with Osburn's "I'm in a mess" reinitiation before the 7:25 p.m. confession and his "that was not me" comment before his 8:55 p.m. confession.

1. Justice Powell was the fifth vote in favor of renewed interrogation in *Bradshaw,* and in his concurrence, he eschewed a reinitiation test, which he considered to be vague, in favor of examining all circumstances surrounding the second statement such as whether the defendant was re-*Mirandized.*

The majority, nevertheless, casts a blind eye to these facts and relies instead on an Illinois Supreme Court case (*People v. Olivera*, 164 Ill.2d 382, 207 Ill.Dec. 433, 647 N.E.2d 926 (1995)), where procedural questions like "What happened?" at the lineup and "What happens next?" were asked. That is not an analogous or comparable situation to our facts, where Osburn initiated contact by comments to police officers relating to the investigation and to his predicament.

In sum, the majority has found that the circuit judge clearly erred in his findings of fact. To be sure, the principle of right to counsel is of grave importance, but it can clearly be waived under *Oregon v. Bradshaw* even after the right has been invoked by an accused like Osburn. That is what happened in this case.

I would affirm on this point.

b. *Coercion*

Next, the majority holds that the police agents' references to Osburn's twenty-year-old daughter, Holley,[2] in the 4:45 p.m. interrogation about cutting her loose after the interview, coerced a confession that occurred four hours later at 8:55 p.m. That holding is at odds with Arkansas case law and the case law of many of our sister states as well.

As an initial point, the majority's discussion of this issue is unnecessary and is dictum because the majority has already suppressed the confession under point one. Be that as it may, I will address the coercion issue.

The question posed by the majority opinion is whether law enforcement acted within appropriate boundaries by telling Osburn his daughter was under suspicion

and they would "cut her loose" if he talked. An American Law Reports annotation gives a thorough examination of what state and federal courts have done in this area. *See* Carroll J. Miller, Annotation, *Voluntariness of Confession as Affected by Police Statements that Suspects' Relatives Will Benefit by the Confession*, 51 A.L.R.4th 495 (1987 & Supp.2007). Clearly, the holdings are mixed based on the facts of each case and based on the connection of the confession to a perceived benefit to the relative.

Rather than discuss this exhaustive ALR report, the majority cites a California case for the general principle that threats to arrest family members can render a subsequent confession involuntary. *See People v. Weaver*, 26 Cal.4th 876, 29 P.3d 103, 111 Cal.Rptr.2d 2 (2001). No one disputes that, but whether the confession should be suppressed depends on the facts of each case. The majority then relies on *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), where an accused was told he could not call his wife until after he was booked and charged with robbery.

Those express or direct threats do not exist in the instant case. Furthermore, unlike the *Haynes* factual scenario, Holley was a key witness because she was with her father the morning of the murder and was under suspicion herself for making contradictory statements to police officers and for interfering with the investigation. The circuit judge recognized this fact and found in his order that no pressure relating to Holley caused Osburn to make any incriminating statements. The majority, however, applies the fruit-of-the-poisonous-tree doctrine to reverse the circuit judge

---

**2.** The record spells her name "Holley," but she is referred to as "Holly" in the interview

transcripts.

on this point but cites no case law for this application.

Several additional points militate against the majority's coercion conclusion. First, Osburn did not confess at the 4:45 p.m. interrogation when the majority contends the pressure regarding Holley was brought to bear on him. The majority quotes extensively from that session with law enforcement, but rather than feel pressured to confess, Osburn did not confess and invoked his right to counsel at the conclusion of the interview. The facts speak for themselves. His will was not overborne.

Added to this is the fact that nowhere in the 4:45 p.m. interrogation is there a specific or direct threat of arrest or prosecution made toward Holley. There were references to public embarrassment, because she would be a key witness at trial since she had been taken to work by Osburn the morning of Casey Crowder's murder. But there were no direct threats of arrest or charges, even though Holley was under suspicion because of contradictory statements she had made during the course of the investigation and because she would not let her brother, Kenny, Jr., answer questions. CID Agent Newton testified at the suppression hearing that she became a suspect for potential prosecution for obstruction of justice.

Nor did Osburn ever testify that he was coerced. In fact, he did not take the stand at trial or even testify at the suppression hearing. FBI Agent Boshears and CID Agent Newton did say they would "cut [Holley] loose" in the 4:45 p.m. investigation after they were done with Osburn. But CID Agent Newton also testified at the suppression hearing that he had no knowledge that Holley was being questioned at the time of the interrogation with Osburn. FBI Agent Boshears added that he was not aware that Holley was going to

be detained and that she was not detained at that time by him. Vague statements about cutting Holley loose was a ploy used by law enforcement in its arsenal of tricks, but it hardly rises to the level of a direct threat of a criminal charge and prosecution against Holley unless Osburn confessed.

Other courts, including Arkansas, have dealt with the precise issue of psychological tactics using family members and affirmed their usage. Just ten years ago, in a case where alleged threats were made against the mother and brother of the accused to obtain a confession, this court held as follows:

> Even if Mr. Rankin's testimony were believed by the trial court, the police may use some psychological tactics and coercive statements in eliciting a custodial statement from the accused so long as the means employed are not calculated to procure an untrue statement, and the accused's free will is not completely overborne. *Conner v. State,* [334 Ark. 457, 982 S.W.2d 655 (1998)]. We have previously held that an officer's threat to arrest the accused's wife, although obviously intended to influence the accused, did not render the statement involuntary. *Hood v. State,* 329 Ark. 21, 947 S.W.2d 328 (1997). In this case, Mr. Rankin decided to give his confession right after Detectives Cooper and Addison showed him the murder weapon. Under these circumstances, we are unable to say that Mr. Rankin's free will was completely overborne by any alleged threat to detain his mother and brother, or that such a threat procured an untrue statement.

*Rankin v. State,* 338 Ark. 723, 729, 1 S.W.3d 14 (1999); *see also Hood v. State,* 329 Ark. 21, 947 S.W.2d 328 (1997).

Similarly, in *Hood v. State,* we said:

> As to the officers' appeal to Hood to consider the health of his wife and the

threat of her arrest, we have observed that the police may, without violating an accused's rights, attempt to play on his sympathies or explain to him that honesty is the best policy, provided that the accused's decision to make a custodial statement is voluntary in the sense that it is the product of the accused's exercise of his free will. *Id.*; *see also Misskelley* [*v. State*], *supra* [323 Ark. 449, 915 S.W.2d 702 (1996)] (police may use some psychological tactics in eliciting a custodial statement from an accused). Although the interrogating officers' statements were obviously intended to influence Hood, we are unable to say that they were improper or contrary to basic notions of fairness, or that they procured an untrue statement.

329 Ark. at 33–34, 947 S.W.2d at 335. Is the majority overruling *Rankin* and *Hood* with today's decision?

In recent years, many state courts have failed to find a confession involuntary based on promises relating to family members for a variety of reasons. *See, e.g., Cain v. State,* 594 |₅₅N.E.2d 835, *on reh. remanded,* 599 N.E.2d 625 (Ind.App. 1992) (in order to show involuntariness, must show direct threats against family members); *Com. v. Raymond,* 424 Mass. 382, 676 N.E.2d 824 (1997) (suggestion that mother might be prosecuted as an accessory for lying about whereabouts of car not sufficient coercion); *Reynolds v. State,* 327 Md. 494, 610 A.2d 782 (1992) (where defendant investigated for sexual abuse of two daughters, statement by officer that truth would "help" one daughter did not induce confession); *State v. Stephenson,* 144 N.C.App. 465, 551 S.E.2d 858 (2001) (officers' statements that son was well behaved, that they observed closeness defendant had with her son, and that son deserved a better life than he was now experiencing did not amount to

coercion); *Martinez v. State,* 127 S.W.3d 792 (Tex.Crim.App.2004) (confession not coerced where detective made no positive promise to defendant that if he confessed, brother and sister would not be charged); *State v. Gonzales,* 46 Wash.App. 388, 731 P.2d 1101 (1986) (promise by detective to attempt to get suspect's wife released from custody would not alone render confession involuntary).

Had the law enforcement officers specifically and directly threatened to charge Holley as an accessory to murder if Osburn did not confess, my view of the case would be different. But those are not the facts. Rather, vague psychological tactics involving Holley were employed. That is permissible under our case law. *See Rankin v. State,* 338 Ark. 723, 1 S.W.3d 14; *Hood v. State,* 329 Ark. 21, 947 S.W.2d 328. Moreover, Holley was under suspicion.

|₅₆As a final point, it is important to note that Holley's name never came up in the later 7:25 p.m. interrogation or the 8:55 p.m. interrogation, both of which resulted in confessions. Plus, Osburn met with Holley; Kenny, Jr.; and his mother for a fifteen-minute discussion before the 8:55 p.m. confession. Any misconceptions about Holley's status, assuming there were any, were clarified, no doubt, at that time. The majority simply has not made a case for coercion, either under the law or these facts.

I would affirm on this issue as well.

c. *Connie Sparks—404(b)*

I further disagree with the majority's analysis of the Rule 404(b) issue for the same reasons set out in Chief Justice Hannah's dissenting opinion on this point. The Sparks offense and the Crowder murder have little factual commonality but, more importantly, the Sparks bad act is twenty-seven years old. With the notable

exception of pedophile cases (*see, e.g., Allen v. State*, 374 Ark. 309, 287 S.W.3d 579 (2008)), I know of no Arkansas cases that have gone so far back in time to prove intent or plan under 404(b). The more appropriate reversal and remand for trial would be on this point.

But any holding on this twenty-seven-year-old bad act is largely irrelevant in light of the fact that the majority has thrown out the 8:55 p.m. confession. Because of this, I am exceedingly doubtful that a retrial will occur where the 404(b) issue would be resurrected.

For all of these reasons, I respectfully dissent.

JIM GUNTER, Justice, dissenting.

|57I join in the portion of Justice Brown's dissenting opinion that the 09.28.06 8:55 interview was not the result of an *Edwards* violation.

I also agree with Justice Brown's conclusion that Osburn's confessions were not the product of intimidation and coercion. The tactics used by Agents Newton and Boshears, according to the majority, were coercive in nature because they appealed to Osburn's concern for his children. This, I must say, is contrary to our prior case law. We have observed that the police may, without violating an accused's rights, attempt to play on his sympathies or explain to him that honesty is the best policy, provided that the accused's decision to make a custodial statement is voluntary in the sense that it is the product of the accused's exercise of his free will. *Pilcher v. State*, 355 Ark. 369, 136 S.W.3d 766 (2003) (quoting *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997)). We have further stated that the police may use some psychological tactics in eliciting a custodial statement from the accused, so long as the means employed are not calculated to procure an untrue statement, and the ac-

cused's free will is not completely overborne. *Id.*

A review of the transcripts from the 09.28.06 4:45 interview does not reveal that Agents Newton and Boshears improperly used coercive or intimidating tactics. On the contrary, the transcripts show that Newton and Boshears were appealing to Osburn's sympathies when they explained to Osburn that his children may be "embarrassed" and "dragged into" the investigation. Similar tactics have been approved of by this court. In |58*Hood, supra*, this court held that threats to arrest Hood's wife did not render his confession involuntary. Again in *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999), this court approved of tactics appealing to an accused's concern for family. Rankin alleged that his interrogators told him that his brother and mother were going to be held at the police station until he gave an incriminating statement. We held that even if Rankin's allegations were believed to be the truth, such tactics, alone, would not cause his statement to be involuntary. Additionally, in *Pilcher, supra*, we made no finding of police coercion where Pilcher's statements were obtained after interrogators threatened to prosecute Pilcher's parents. I find the alleged coercive acts in the instant case to be not so unlike the sets of facts in our prior cases where we approved of such psychological tactics. Moreover, I must note that no threats of violence or physical harm were made by Osburn's interrogators. After reviewing the transcripts of Osburn's interviews, I simply cannot say that Osburn's statements were the product of coercive and intimidating police tactics.