Cite as 2022 Ark. App. 437

# ARKANSAS COURT OF APPEALS
DIVISION II
No. CR-21-576

| | | | |
|---|---|---|---|
| TRAVIS PARKS | | Opinion Delivered November 2, 2022 | |
| | APPELLANT | | |
| | | APPEAL FROM THE POLK COUNTY CIRCUIT COURT [NO. 57CR-19-248] | |
| V. | | | |
| STATE OF ARKANSAS | | | |
| | APPELLEE | HONORABLE CHARLES A. YEARGAN, JUDGE | |
| | | AFFIRMED | |

**BART F. VIRDEN, Judge**

Travis Parks appeals his conviction by a Polk County Circuit Court jury of internet stalking of a child in violation of Ark. Code Ann. § 5-27-306(a)(2) (Supp. 2021), and computer child pornography in violation of Ark. Code Ann. § 5-27-603(a) (Repl. 2013). We affirm.

I. *Relevant Facts*

On December 23, 2019, the State filed a criminal information alleging that Parks committed internet stalking of a child and computer child pornography. On October 9, 2020, Parks filed a motion to suppress evidence, asserting that he anticipated the State would offer evidence of his communications regarding satanic activities or satanic sex rituals and his profile picture on the social media app MeetMe, which depicted a satanic figure. Parks asserted that the evidence was not essential to prove an element of the crimes charged, and

it was more prejudicial than probative and inadmissible under Ark. R. Evid. 403. Additionally, Parks filed an amended motion to suppress statements he made and physical evidence seized pursuant to an investigatory traffic stop. Parks asserted that during the illegal stop, he was detained, placed in handcuffs, and questioned without having been informed of his *Miranda* rights, and the statements he made during this time should be suppressed. Parks contended that the iPhone found during the vehicle search subsequent to his arrest (including photographs of the iPhone as well as messages or photographs of messages appearing on the phone) and the condoms found in the pat-down search conducted later were seized pursuant to an illegal stop; thus, the evidence collected was the fruit of the poisonous tree.

At the motion hearing, Officer Jacob Cain, formerly with the Mena Police Department, testified that pursuant to an undercover investigation, he created a false account on the social media/dating website app MeetMe. Officer Cain's false profile was that of an eighteen-year-old girl named "Amber," and he posted photos of a fifteen-year-old-girl to the account.[1] On December 21, a person claiming to be a twenty-seven-year-old man named "Baph" contacted Amber through MeetMe, and they began a conversation. Baph's profile photo was that of a red-skinned, goat-headed person in front of a red background. Officer Cain testified that, as Amber, he informed Baph that he was fourteen years old—not eighteen as his profile indicated. During their conversation, Baph stated that he was looking

---

[1]Officer Cain used past photos of his twenty-five-year-old friend with her permission.

for "fun and willing girls to participate in certain satanic activities" and sex rituals. Baph requested that Amber send him nude photographs, which Amber refused to do. Amber requested that Baph use condoms during their sexual encounter, which Baph explained would be difficult due to his large size. Eventually, Amber agreed to meet with Baph to engage in sexual activity. Baph suggested they meet at the Dollar General in Mena near Amber's fictional home address, and they set the meeting time for 2:00 a.m. Baphstated that he would be driving a small white car and messaged Amber several times along his route to Mena. At 2:00 a.m., Officer Cain received a message from Baph that he had arrived at Dollar General. Within moments, Officer Cain (who was parked across the street in an empty parking lot) saw a small white car enter and drive slowly through the Dollar General parking lot. There were no other cars around. Officer Cain testified that he turned on his blue lights and conducted a stop. He told Parks to exit the car and put his hands on the back of the car. The dash-cam video played during the hearing showed Officer Cain telling Parks to exit the car and put his hands on the back of the car. Parks was handcuffed, and Officer Cain asked, "What are you doing, man?  What are you doing down here?" Parks answered that he was "just driving around," and the following exchange occurred:

OFFICE CAIN:         Where you comin' from?

MR. PARKS:           Alma.

OFFICER CAIN:        Alma?

MR. PARKS:           Uh-huh.

OFFICER CAIN:        Okay. What's your name?

3

MR. PARKS:          Travis.

OFFICER CAIN:       Travis?

MR. PARKS:          Parks.

OFFICER CAIN:       Travis Parks. Okay. Allright. Just driving around, huh?

MR. PARKS:          Yes, sir.

OFFICER CAIN:       That's your story?

MR. PARKS:          Well, I was supposed to meet a girl.

OFFICER CAIN:       What's her name?

MR. PARKS:          Uh, Ashley or Amber, something like that.

OFFICER CAIN:       Okay. All right. How old is Amber?

MR. PARKS:          Eighteen.

OFFICER CAIN:       Okay. All right. Alrighty. You're under arrest for internet stalking of a child.

MR. PARKS:          She's eighteen on the Meet Me.

OFFICER CAIN:       Okay. We'll talk about it.

Office Cain testified that he conducted a pat-down search of Parks and retrieved a mostly full bottle of alcohol. During the search of Parks's car, Officer Cain found and took photographs of a cell phone. Later, during a pat-down search at the police station, Officer Cain found two Trojan Magnum condoms in Parks's pocket. Officer Cain testified that at the police station, he read Parks his *Miranda* warning and interviewed him. At 3:56 a.m. Officer Cain questioned Parks about his references to satanic acts, rituals, and his profile

picture that depicted a goat-headed, red-skinned figure. Parks stated that the Baph profile was his and that he had messaged Amber as Baph.

In closing, counsel argued that Officer Cain did not have reasonable suspicion to conduct a stop of Parks's vehicle. Moreover, counsel asserted, Parks's answers to Officer Cain's "roadside questions" were the fruit of the poisonous tree because Parks was detained and questioned without receiving a *Miranda* warning. Counsel argued that Parks's second Mirandized statement was tainted by the first statement because Office Cain employed a tactic of gaining a confession without a *Miranda* warning, then after Mirandizing the suspect, getting the suspect to repeat the confession. Counsel explained that this was a form of coercion in which the suspect does not feel like he has any other option but to repeat his earlier statement. Regarding the "satanic issue," counsel argued that any evidence of satanic activity or association should be suppressed because it was not necessary to prove any element of the crime; thus, it was irrelevant, highly prejudicial, and inadmissible.

The State responded that because Parks identified himself as Baph, evidence regarding satanic activity was relevant to prove Parks's identity. The State asserted that when Officer Cain showed Parks the profile photo of Baph and asked what it meant, Parks explained that it depicted Baphomet, a satanic figure, which proved that the person Cain was chatting with was Parks. Accordingly, references to Baph and other satanic activity were highly relevant for proving identity.

The court granted the motion to suppress in part and denied it in part. Specifically, the court suppressed the evidence of the alcoholic beverage seized after the stop and all

statements Parks made before he was Mirandized. The court denied the motion to suppress as to the iPhone and the condoms. The court determined that Officer Cain had reasonable and articulable grounds to conduct the investigative stop of Parks's vehicle, and the testimony and exhibits depicting satanic activities and sex rituals were relevant to prove Parks's state of mind, intent, plan, preparation, and opportunity to solicit and identity as Baph.

At the trial, the following evidence was adduced. As a part of an undercover investigation, Officer Cain created a false profile on MeetMe for Amber, an eighteen-year-old girl. Around 12:00 p.m. on December 21, Baph, whose profile photo was that of a "satanic goat figure," messaged Amber. Amber immediately told Baph that her real age was fourteen, not eighteen, and Baph told her that he was "look[ing] for fun and willing girls to participate in certain satanic activities" and that he was interested in "satanic sexual rituals." Baph requested nude photos, which Amber refused to send. They discussed having sex in various ways, and Amber requested that Baph use condoms to prevent pregnancy. Baph informed Amber that he would be driving a small white car, and it would take about an hour and a half for him to get to the agreed meeting place, the Dollar General in Mena. They agreed to meet at 2:00 a.m. that morning. Baph messaged Amber several times along his journey to Mena, and at 2:00 a.m. he sent her a message that he had arrived at Dollar General. At that time, Officer Cain, who was parked across the street, saw a small white car enter the parking lot of Dollar General. The car circled the lot, and about a minute later, Officer Cain stopped the vehicle. Officer Cain arrested Baph who was later identified as

6

Parks, and he seized a cell phone that displayed a message from Amber. During a pat-down search at the station, Officer Cain found two condoms in Parks's pocket.

Parks testified in his defense. He explained that he used the MeetMe app to contact Amber whom he believed to be eighteen years old. Parks testified that the screenshotted messages between them in evidence, including references to satanic activity and requesting nude photographs, were accurate; however, he explained that he did not practice Satanism, and no satanic paraphernalia was found in his car when he was arrested. He testified that he only referred to satanic activity to get the attention of other app users. Parks stated that as he was on his way to Dollar General, he messaged Amber to inform her of his progress. Parks recalled that he was approximately one minute away from Dollar General when he sent the message that he was there, and he entered the parking lot shortly after the message was sent. He stated that if he had seen anyone in the parking lot, he would have "done the same thing I did, just made a loop to try to turn around and go home" and that by the time he arrived at the meeting place, he was disgusted with himself and "just wanted to turn around and go home."  Parks explained he would not have stopped the car in the parking lot and did not stop until he was pulled over. Parks testified that he chose the profile name Baph as a reference to Baphomet, a satanic figure, but that he did not know much about the name or its origin.

The jury found Parks guilty of both counts. Parks was sentenced to twenty years' imprisonment in the Arkansas Department of Correction for internet stalking of a child and

twenty years' imprisonment for computer child pornography, to run consecutively. Parks timely filed his notice of appeal.

## II. *Discussion*

### A. Search and Seizure Following Traffic Stop

On appeal, Parks argues that Officer Cain did not have a reasonable suspicion to conduct the traffic stop in the Dollar General parking lot; thus, the stop was illegal, and any evidence gathered pursuant to that stop is inadmissible. His argument is not well taken.

In reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review considering the totality of the circumstances, reviewing findings of facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *Menne v. State*, 2012 Ark. 37, 386 S.W.3d 451. We reverse only if the circuit court's ruling is clearly against the preponderance of the evidence. *Id.*

Pursuant to Arkansas Rule of Criminal Procedure 3.1,

[a] law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger or forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct.

"Reasonable suspicion" is defined as a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as

8

opposed to an imaginary or purely conjectural suspicion. Ark. R. Crim. P. 2.1. Whether there is reasonable suspicion depends on whether, under the totality of the circumstances, the police have "specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity." *Menne*, 2012 Ark. 37, at 6, 386 S.W.3d at 455 (quoting *Malone v. State*, 364 Ark. 256, 263, 217 S.W.3d 810, 814 (2005)). A hunch does not constitute reasonable suspicion to justify a stop. *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Parks cites *Lambert v. State*, 34 Ark. App. 227, 229, 808 S.W.2d 788, 789 (1991), to support his argument that Officer Cain did not have reasonable suspicion to justify an investigative stop. In *Lambert*, a highway patrol officer received an anonymous tip that a man named "Jerry" would be leaving the Hot Springs area around 3:00 p.m. and that he would be driving a black truck with "Woodline Motor Freight" written in orange on the side and hauling a short-bed trailer. The anonymous informant stated that Jerry had ten pounds of marijuana in the truck. The officer set up surveillance along Highway 70 East, and around 3:50 p.m., he saw an approaching truck matching the description given in the anonymous tip. He conducted a stop and discovered that the driver of the vehicle was named Jerry Lambert. The officer immediately advised Jerry of his *Miranda* rights, then asked if there was any marijuana in the truck. Jerry said that there was and retrieved it from the truck. Later, Jerry filed a motion to suppress based on lack of reasonable suspicion for the stop, which the circuit court denied. We reversed the circuit court's decision, holding that "an anonymous tip, standing alone, will not ordinarily give rise to the reasonable suspicion necessary to justify an investigatory stop." *Lambert*, 34 Ark. App. at 229, 808 S.W.2d at 789. *Lambert* is

9

distinguishable from the instant case because Officer Cain had specific, particularized, and articulable reasons for conducting the stop. Parks told Officer Cain that he would be driving a small white car and messaged Officer Cain several times on his way to the meeting place, keeping him aware of his progress. At approximately 2:00 a.m., the ascribed meeting time, Parks sent a message to Officer Cain stating that he had arrived. Immediately thereafter, a small white car pulled into the parking lot of Dollar General, the designated meeting place; thus, Officer Cain relied on more than bare suspicion in deciding to make the investigatory stop and had minimal, objective justification to conduct the stop. Considering the totality of the circumstances, the above facts gave rise to reasonable suspicion or probable cause, and the circuit court did not err in denying the motion to suppress the evidence gather pursuant to the stop.

## B. Interrogation Colored by Continuing Illegal Influences

For his second point on appeal, Parks asserts that he made his first statement to Officer Cain during the investigatory stop without having received a *Miranda* warning; thus, the first statement tainted the second Mirandized statement made at the police station, and his second statement should have been suppressed. Parks contends that "when the original confession has been made under illegal influences, such influences will be presumed to continue and color all subsequent confessions, unless the contrary is shown." Parks's argument fails.

A statement made while in custody is presumptively involuntary, and the State must prove by a preponderance of the evidence that the defendant made the custodial statement

10

voluntarily, knowingly, and intelligently. *Akram v. State*, 2018 Ark. App. 504, at 6, 560 S.W.3d 509, 514. With respect to the fruit-of-the-poisonous-tree doctrine, the pertinent inquiry is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Osburn v. State*, 2009 Ark. 390, at 20, 326 S.W.3d 771, 784 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). To determine whether a waiver of *Miranda* rights is voluntary, our court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* In order to make this determination, this court reviews the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Jackson v. State*, 2013 Ark. 201, at 14, 427 S.W.3d 607, 616. This court will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.*

Parks cites *Osburn*, 2009 Ark. 390, at 18–19, 326 S.W. 3d 771, 784, to support his argument that his second Mirandized statement was tainted by the first statement made without the benefit of the *Miranda* warnings. In *Osburn*, on September 28, then suspect Osburn was arrested for the kidnapping and murder of a seventeen-year-old girl, and at 4:45 p.m., he underwent questioning in an outbuilding on his friend and former coworker's

11

property, who was the sheriff-elect at the time. During this interview, Osburn asked for an attorney, but the investigators did not terminate the interview. The investigators told Osburn how painful and embarrassing this was for his family, attempting to elicit a confession, but Osburn again asked for an attorney. The interview continued, and the investigators asked Osburn if he was protecting someone else, stating, "We've accounted for Holly's [his daughter's] whereabouts. Is it Kenny Jr.?" and "Are you, are you protecting your son?" Osburn asked for an attorney again, and the interview was terminated. A second interview took place after a break during which he was allowed to meet with his family. Osburn's *Miranda*-rights form was reviewed, and at that time, he confessed to his involvement in the kidnapping and murder of the victim. Osburn was transported to the Southeast Arkansas Law Enforcement Center, and at 8:55 p.m., Osburn completed his *Miranda*-rights form, and he again confessed.

> The supreme court held that

> [t]he transcript and recording of the 09.28.06 4:45 interview adequately demonstrate an interview replete with evidence of coercion. Indeed, there is no dispute that the transcripts of the statements in this matter are accurate, and we simply cannot ignore the blatant coercion that occurred.

> . . . .

> We simply cannot ignore the coercive statements in the interview itself, nor the statements by Agent Boshears during his conversation with Osburn following his invocation of the right to counsel and prior to the 09.28.06 7:25 interview, which continually suggested to Osburn that he might not be able to see his family or that his daughter might be arrested, unless he confessed.

> . . . .

12

Here, it is clear that Osburn's will was overborne by the coercive tactics used during the entirety of the interview process following his arrest. Accordingly, we are of the opinion that the circuit court's finding that Osburn's statement resulting from the 09.28.06 7:25 interview was voluntarily made was clearly against the preponderance of the evidence. We further hold that because Osburn's 09.28.06 8:55 statement was quite clearly a fruit of the 09.28.06 7:25 interview, it too should have been suppressed.

Parks contends that, as in *Osburn*, his second Mirandized statement two hours after the first statement was so close in time that he "was in no way free of the psychological and practical disadvantages of having confessed." Also, Parks notes that *Osburn* is similar to the instant case in that both he and Osburn were in continuous custody between the two statements, and the same investigator was involved in both statements. *Osburn* is clearly distinguishable from the instant case in that no coercion occurred in the first interview during which Officer Cain asked a few "roadside" questions. In addition to considering the length of time between confessions and that Osburn was in the continuous custody of the same officer, the supreme court considered that Osburn requested counsel but had not been provided counsel "and, in fact, was ushered into the latter statement by his friend and former employer, the then-sheriff-elect." *Osburn* is inapposite to the instant case because Officer Cain did not use coercive tactics.

The Supreme Court has held that failure to advise a suspect of his or her *Miranda* rights is not inherently coercive such that a later Mirandized statement is rendered inadmissible. In *Oregon v. Elstad*, 470 U.S. 298 (1985), a police officer, while serving an arrest warrant, questioned a suspect without giving *Miranda* warnings. The officer told the suspect that he knew Elstad was involved in a burglary, to which Elstad replied, "Yes, I was there."

13

*Id.* at 301. Elstad was then arrested and taken to the police station. *Id.* Over an hour later, the officer advised Elstad of his *Miranda* rights, which Elstad waived and gave a full confession. The Supreme Court held that the subsequent post-*Miranda* statement was admissible. "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314. Such is the case here. There was no evidence presented that Officer Cain used coercive tactics similar to the investigators in *Osburn*, and the circuit court's decision to deny Parks's motion to suppress was not made against the preponderance of the evidence.

### C. Statements About Religion

Parks argues that evidence regarding satanic activity is inherently prejudicial, and the evidence of "satanic sex rituals" and his profile picture featuring Baph had very little probative value or relevance. He contends that the only purpose of such evidence is to inflame the passions of the jury. We disagree.

A circuit court has broad discretion in deciding evidentiary issues, and its decisions will not be reversed absent an abuse of that discretion. *Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. Arkansas Rule of Evidence 402 further provides that "[e]vidence which is not relevant is not admissible." Although relevant, evidence may be excluded if its probative value is substantially

14

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Ark. R. Evid. 403. However, the State is entitled to prove its case as conclusively as it can. *Turner v. State*, 2014 Ark. App. 428, at 3, 439 S.W.3d 88, 89. Merely cumulative evidence is not prejudicial, and corroborating evidence may withstand Rule 403's balancing test. *Id.* The balancing of probative value against prejudice under Rule 403 is a matter left to the circuit court's sound discretion. *Davis v. State*, 368 Ark. 401, 246 S.W.3d 862 (2007).

Under Ark. Code Ann. § 5-27-306(a)(2), a person commits the offense of internet stalking of a child if the person being twenty-one years of age or older knowingly uses a computer online service, internet service, local internet bulletin board  service, or any means of electronic communication to "[s]educe, solicit, lure, or entice an individual that the person believes to be fifteen (15) years of age or younger in an effort to arrange a meeting with the individual for the purpose of engaging in" sexual intercourse, sexually explicit conduct, or deviate sexual activity.

The circuit court admitted the evidence regarding Parks's references to satanic activity and his profile picture for the purpose of showing Parks's state of mind, intent, plan, preparation, and opportunity to solicit, lure or entice a meeting under Ark. Code Ann. § 5-27-306.  Also, the court found that the evidence was relevant to prove Parks's identity as Baph. At trial, Parks testified that the purpose of choosing Baph as his profile identity and referring to satanic activity was to get the attention of other app users, to stand out among the other profiles, and to seem "cool"; thus, Parks's references to satanic activity, under the

15

facts of this case, are probative of his intent and plan to solicit Amber and lure and entice her, which are elements of the crime of internet stalking of a child. Additionally, evidence of Parks's use of the profile name Baph was relevant to prove his identity. "A key element that must be proved in every case is that the defendant is the person who committed the crime." *Turner*, 2018 Ark. App. 5, at 15, 538 S.W.3d at 238. The references to Baph and the profile picture of the satanic figure were relevant to show that Parks was Baph and that he committed the crimes of internet stalking of a child and computer child pornography. Accordingly, the circuit court did not abuse its discretion by finding that the probative value of the references to satanic activity was not substantially outweighed by any potential prejudice and admitting the evidence.

Affirmed.

GRUBER and VAUGHT, JJ., agree.

*Lisa-Marie Norris*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.